**Gail PROSTROLLO et al., Appellees,**

v.

**The UNIVERSITY OF SOUTH DA-KOTA et al., Appellants.**

**No. 74–1184.**

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 14, 1974.

Decided Dec. 6, 1974.

Rehearing Denied Dec. 18, 1974.

Certiorari Denied April 28, 1975. See 95 S.Ct. 1687.

---

Carleton R. Hoy, Davenport, Evans, Hurwitz & Smith, Sioux Falls, S.D., for appellants.

Michael B. Crew, Crew & Crew, Vermillion, S. D., for appellees.

Before VOGEL, Senior Circuit Judge, and LAY and STEPHENSON, Circuit Judges.

LAY, Circuit Judge.

The University of South Dakota, Dr. Richard Bowen, its President, A. L. Schnell, Director of Resident Serv-

ices, and the Board of Regents of the State of South Dakota appeal from a decision of the district court declaring certain University housing regulations unconstitutional. The named plaintiffs, Gail Prostrollo and Lynn Severson, are students at the University of South Dakota. They brought this suit on behalf of themselves and other students similarly situated to challenge a regulation which requires all single freshman and sophomore students to live in University residence halls. They contend that enforcement of this rule encroaches upon their right of privacy and denies them equal protection of the laws. The district court found that the *primary* purpose of the regulation was to ensure housing income sufficient to pay off the revenue bonds which had been issued to finance the construction of the dormitories. It concluded that the regulation was unconstitutional, since it established an arbitrary and unreasonable classification which had no rational relationship to this purpose and therefore denied petitioners equal protection of the laws.

Prostrollo v. University of South Dakota, 369 F.Supp. 778 (D.S.D.1974). We find the regulation constitutional and reverse and remand the case with directions to enter judgment for the defendants.[1]

The challenged regulation provides:

All single freshman and sophomore students are required to live in university residence halls. Exceptions to this policy must be approved by the Director of Resident Services prior to the beginning of the semester.

School officials offered several justifications for this parietal rule.[2] Dr. Richard L. Bowen, the University president, said that the rule had at least two purposes. First, he stated, it was intended to provide a standard level of occupancy to ensure repayment of the government bonds which provided capital for the dormitory construction.[3] Second, he said, it was meant to ensure that younger students who must of necessity live away from home while attending the University would avail themselves of the learning experience in self-government,

---

1. The defendants have raised several points of error, but since we find that the regulation is constitutional we need discuss only one. Nonetheless, we note they have challenged the jurisdiction of the district court to entertain the subject matter on the ground that a constitutional challenge to a school regulation should be heard by a three-judge court convened under 28 U.S.C. § 2281. The regulation challenged here, however, does not have statewide application, and a three-judge court was not required. *See* Board of Regents of University of Texas System v. New Left Educational Project, 404 U.S. 541, 92 S.Ct. 652, 30 L.Ed.2d 697 (1972).

We also note that jurisdiction is premised on 42 U.S.C. § 1983 and 28 U.S.C. § 1343. Although the defendants have not raised this jurisdictional question, we think it is fundamental that the University of South Dakota and the corporate body constituting the Board of Regents, both political subdivisions of the state, may not be sued under the Civil Rights Act since neither entity constitutes a "person" within the meaning of § 1983. Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973) ; Moor v. County of Alameda, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973) ; Jorden v. Metropolitan Utilities District, 498 F.2d 514 (8th Cir. 1974) ; cf. Board of Trustees v. Davis, 396 F.2d 730 (8th Cir.), cert. denied, 393 U.S.

962, 89 S.Ct. 401, 21 L.Ed.2d 375 (1968). The district court erred in assuming it had jurisdiction of plaintiffs' complaint against these defendants under § 1343.

2. Both parties and the court below consistently use the term "parietal" rule in describing the housing regulation. The New Webster's Dictionary of the English Language defines that term as an adjective meaning "of or relating to life within college walls or its order or regulation." Its derivation is discussed in Pratz v. Louisiana Polytechnic Institute, 316 F.Supp. 872, 876 n. 2 (W.D.La. 1970), appeal dismissed, 401 U.S. 951, 91 S. Ct. 1186, 28 L.Ed.2d 234, aff'd, 401 U.S. 1004, 91 S.Ct. 1252, 28 L.Ed.2d 541 (1971).

3. S.D.C.L. § 13–51A–38 adopted by the South Dakota Legislature in 1971 reads :

*Parietal rules.*—In connection with the issuance of any bonds under this chapter, and in order to secure the payment of any such bonds and the interest thereon, the board shall have the power for each such institution to make and enforce and agree to make and enforce parietal rules that shall ensure the use of any project to the maximum extent to which such project is capable of serving students, staff members and others using or being served by, or having the right to use or the right to be served by, or to operate, any project.

group discipline, and community living that dorm life provides, as well as the increased opportunity for enriching relationships with the staff and other students. Aaron Schnell, Director of Resident Services, emphasized the educational benefits of living on campus, such as the availability of films and discussion forums. Dr. Richard Gibb, the Commissioner of Higher Education for the South Dakota Board of Regents, freely admitted the financial reasons for the rule, but throughout his testimony, he also emphasized the various educational advantages of dormitory living. Michael Easton, the Director of Student Services, observed:

[T]he facilities for studying are more accessible to those people who live on campus. It's easier for them to get to the library, for example; the atmosphere on campus is more conducive to study. It's encouraged. . . .

There are control factors which eliminate the amount of confusion and noise. The emphasis on campus is academic . . . where off campus it's frequently not.

▮ The overall evidence demonstrates that these University officials believe that dormitory living provides an educational atmosphere which assists *younger* students, as underclassmen, in adjusting to college life.[4] The testimony reflects a belief that students who become "established" and well-oriented in their early years are more prone to develop those good study habits which will assist them in their years as upperclassmen. Despite this testimony, the

4. The defendants have adopted answers to interrogatories from another pending case in the federal district court in the Southern District of Iowa. Iowa university officials were asked to list the advantages and disadvantages of dormitory living. They listed them as follows:

| ADVANTAGES | DISADVANTAGES |
|---|---|
| 1) meals prepared | 1) too restrictive |
| 2) maid service | 2) isolation from the opposite sex |
| 3) meet more people | 3) student not responsible for self |
| 4) group activities, movies | 4) can't study |
| 5) ideal location | 5) too noisy |
| 6) laundry service | 6) too expensive |
| 7) activities | 7) no liquor |
| 8) communication | 8) rooms too crowded |
| 9) more a part of campus life | 9) parking |
| 10) experiencing different life styles | 10) standing in line |
| 11) supervision for young and immature | 11) poor quality of food |
| 12) equipment available | 12) lack of privacy |
| 13) develop feeling of belonging | 13) no choice of roommates |
| 14) educational environment | 14) having roommates |
| 15) counselors available | 15) not sufficient study lounges |
| 16) advisors spot problems early | 16) prolongs adolescence |
| 17) feel a part of group | 17) too social |
| 18) Reserve Library | 18) maybe escape |
| 19) forced to meet people and get along | |
| 20) more recreational opportunities | |
| 21) vending machines | |
| 22) stores in dorms | |
| 23) refrigerators | |
| 24) freedom from household duties | |
| 25) learn to be more tolerant of others | |
| 26) easier to keep up with current activities | |
| 27) help one another with homework | |
| 28) easier to meet people | |

district court in its original opinion, as well as in a supplemental opinion filed under a Rule 60(b) proceeding,[5] emphasized its factual conclusion that the *primary* purpose of the parietal rule was to defray the costs of the revenue bonds. It found the reasons relating to educational values expressed by school officials to be "unconvincing and unsupported by the evidence." It was on the basis of the finding of this primary purpose that the court concluded that the classification had no rational connection to the purpose of the regulation and therefore denied plaintiffs equal protection of the law. *Cf.* Mollere v. Southeastern Louisiana College, 304 F.Supp. 826 (E.D.La.1969).

We need not decide whether the court's finding regarding the primary purpose of the rule is clearly erroneous.[6] The district court's error, we believe, was in deciding the reasonableness of the classification on the basis of a single "primary" purpose in the face of evidence revealing multiple purposes. This is a misapplication of the standards governing the equal protection clause. In discussing equal protection principles, the Supreme Court recently observed:

> [O]ur decisions do not authorize courts to pick and choose among legitimate legislative aims to determine which is primary and which subordinate. Rather, legislative solutions must be respected if the "distinctions drawn have some basis in practical experience," South Carolina v. Katzenbach, 383 U.S. 301, 331, 86 S.Ct. 803, 820, 15 L.Ed.2d 769 (1966), or if some legitimate state interest is advanced, Dandridge v. Williams, 397 U.S. [471], at 486 (90 S.Ct. 1153, at 1162, 25 L.Ed.2d 491). So long as the state purpose upholding a statutory class is legitimate and nonillusory, its lack of primacy is not disqualifying.
>
> . . . The search for legislative purpose is often elusive enough, Palmer v. Thompson, 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971), without a requirement that primacy be ascertained. Legislation is frequently multi-purposed: the removal of even a "subordinate" purpose may shift altogether the consensus of legislative judgment supporting the statute. Permitting nullification of statutory classifications based rationally on a non-primary legislative purpose would allow courts to peruse legislative proceedings for subtle emphases supporting subjective impressions and preferences. The Equal Protection Clause does not countenance such speculative probing into the purposes of a coordinate branch. We have supplied no imaginary basis or purpose for this statutory scheme, but we likewise refuse to discard a clear and legitimate purpose because the court below perceived another to be primary.

McGinnis v. Royster, 410 U.S. 263, 276–277, 93 S.Ct. 1055, 1062, 35 L.Ed.2d 282 (1973).

The district court concluded that the challenged classification (freshmen and

---

5. While the appeal was pending and upon motion of the defendant, this court certified to the district court a motion to vacate the judgment under Rule 60(b), Fed.R.Civ.P., on the basis of "newly discovered evidence." After the district court refused to vacate its judgment, the record was certified back to this court. No new notice of appeal is required under this procedure. Serio v. Badger Mutual Ins. Co., 266 F.2d 418 (5th Cir.), cert. denied, 361 U.S. 852, 80 S.Ct. 81, 4 L.Ed.2d 73 (1959).

6. We can only assume that the rule requiring students to live in the dormitory was promulgated in compliance with the legislative direction. *See* note 4, *supra.* School officials cannot in this day and age be faulted for requiring students to live in housing constructed by the University. A state policy requiring parietal rules to defray costs of construction is, in itself, not illegal or violative of the Constitution. *See* Pratz v. Louisiana Polytechnic Institute, 316 F.Supp. 872 (W.D.La.1970), appeal dismissed, 401 U.S. 951, 91 S.Ct. 1186, 28 L.Ed.2d 234, aff'd, 401 U.S. 1004, 91 S.Ct. 1252, 28 L.Ed.2d 541 (1971); Pyeatte v. Board of Regents of University of Oklahoma, 102 F.Supp. 407 (W.D.Okla.1951), aff'd, 342 U.S. 936, 72 S.Ct. 567, 96 L.Ed. 696 (1952).

sophomores) had no rational connection to the purpose of paying off the bonds. We would agree. However, there is no evidence on the record that the classification in question was ever intended to have any connection with that purpose. In *Molerre, supra,* relied upon by the district court, where a similar regulation was struck down, the *only* reason women under the age of 21 and freshman men were required to live in the dormitories was because as a group they approximated the number needed to fill the dormitory vacancies. 304 F.Supp. at 827. To the contrary in the present case the only evidence of why the classification was created was the testimony of University officials that they felt that freshman and sophomore students benefited more directly from the educational values of dormitory living.

When no suspect classification is involved or fundamental right infringed, any "rational basis" may justify classifications which have been made. *See* Johnson v. Robison, 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974); McGinnis v. Royster, 410 U.S. 263, 93 S.Ct. 1055, 35 L.Ed.2d 282 (1973); Railway Express Agency v. New York, 336 U.S. 106, 69 S.Ct. 463, 93 L.Ed. 533 (1949) ("any conceivable purpose");

Kotch v. Board of River Pilot Commissioners, 330 U.S. 552, 67 S.Ct. 910, 91 L.Ed. 1093 (1947). We find there exists a rational connection between one of the permissible purposes for the regulation and the classification made.[7]

### Right of Privacy

Although the district court did not pass on the plaintiffs' other contention, *i. e.,* that the regulation violates their right of privacy, this claim is argued on appeal and we must decide it. Aside from equal protection arguments, any law may, of course, be invalid if it clearly violates a fundamental constitutional right. Plaintiffs urge, however, that it is now recognized that when a legislative classification appears to have been made on a suspect basis or encroaches upon a fundamental right, the state has the burden of demonstrating a "compelling interest" which required it. We agree that when those circumstances exist closer judicial scrutiny is required under an equal protection challenge. *See, e. g.,* Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). That is not the case here, however.

---

7. Although not pleaded or discussed in the district court's opinion, the plaintiffs challenge on appeal as well the allegedly unequal enforcement of the regulation. They rely on the University's Handbook on Student Life and Services which reads:

   HOUSING

   Residence Halls

   The University provides eight residence halls for 2,300 students. The University policy requires all single freshman and sophomore men and women who are under 21 years of age to live in University housing. Vermillion residents and other students commuting from home may be excused from living in a residence hall providing a written request is submitted and approved by the Director of Resident Services prior to the start of the school year.

   There was testimony that freshman and sophomore students living in sorority or fraternity houses are also exempted from this regulation.

   These exemptions do not invalidate the regulation. *Cf.* Pratz v. Louisiana Polytech-

   nic Institute, *supra* 316 F.Supp. at 882–883. The policy of allowing a very small number of freshmen and sophomores to live in sorority and fraternity houses is not a serious deviation from the rule. These houses constitute University-approved housing and provide many of the same benefits as do dormitories. The policy of granting exemptions to beginning students who are over 21 is reasonably related to the belief that it is primarily the younger students who will benefit from dorm life. This fact alone distinguishes the equal protection arguments discussed in Cooper v. Nix, 496 F.2d 1285 (5th Cir. 1974). It is reasonable, at least, to assume that beginning students who are 21 and over will not have as much in common with their younger classmates.

   Neither of these exemptions is arbitrary or capricious. When lines are drawn, there will always be some under and over inclusion. This fact alone does not create an equal protection problem. *See* Developments in the Law—Equal Protection, 82 Harv.L. Rev. 1067, 1084–86 (1969).

First, we think it obvious that the classification involved was not made on a "suspect" basis. *See* Johnson v. Robison, 415 U.S. 361, 375 n. 14, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974). The class within the regulation is created on the basis of educational attainment. This classification has never been recognized as an inherently irrational basis for differentiating between persons otherwise equal. *Cf.* Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971) (alienage); Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), and McLaughlin v. Florida, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964) (race); Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944) (national origin).[8]

We move then to the consideration of whether the right involved is "explicitly or implicitly protected by the Constitution." *See* San Antonio School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 1281, 36 L.Ed.2d 16 (1973).

The basic challenge asserted by plaintiffs is that the parietal rule affects (a) their right of privacy and (b) their freedom of association. Plaintiffs rely on Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), which requires the demonstration of a "compelling state interest" before a fundamental right may be encroached upon. However, before applying the compelling interest rule it is basic that both the nature and importance of the rights affected and the extent or nature of the encroachment must first be weighed to determine if the challenged rule constitutes a serious abridgement of a basic interest. *Cf.* Memorial Hospital v. Maricopa County, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974); Cole v. Housing Authority, 435 F.2d 807 (1st Cir. 1970).

■ Plaintiffs urge that inherent within the right of privacy is the right to choose one's home and to live with whomever one chooses. As much as we may strive to protect these goals, we cannot agree that the right to choose one's place of residence is necessarily a fundamental right. Cases too numerous to mention have upheld restrictions on this interest. *See, e. g.,* Village of Belle Terre v. Boraas, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974) (zoning ordinance). This "right" is akin to the interest in education, which the Supreme Court recently held not to be the kind of interest which will invoke the compelling interest test. *See* San Antonio School District v. Rodriguez, 411 U.S. 1, 35, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). This is not, it must be noted, a case in which the right to live in a given geographic area is affected or in which freedom to travel and relocate is abridged as in Dunn v. Blumstein, 405 U.S. 330, 92 S. Ct. 995, 31 L.Ed.2d 274 (1972), or Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). The interest in living precisely where one chooses is not fundamental within our constitutional scheme.

■ Freedom of association has been recognized as a fundamental right, NAACP v. Alabama, 357 U.S. 449, 78 S. Ct. 1163, 2 L.Ed.2d 1488 (1958), but even fundamental rights are not so absolute as to be protected from all incidental effects of otherwise legitimate legislation. For example, in Village of Belle Terre v. Boraas, *supra,* a case challenging zoning laws, one of the rights supposedly infringed was the right of association and, admittedly, the ordinance prevented more than two unmarried adults from living in a single dwelling. The Court found these incidental effects to be too insignificant to invoke strict scrutiny of the statute. The analogy to the instant case is apparent.

Mr. Justice Douglas observed that legislative bodies have historically drawn

---

8. Sex-based classifications and those founded directly on wealth seem to be consistently subjected to a more rigid review (San Antonio School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed. 2d 225 (1971)), though the Court has expressly declined to label them "suspect" bases.

lines when dealing with economic and social problems. He stated:

> But every line drawn by a legislature leaves some out that might well have been included. That exercise of discretion, however, is a legislative not a judicial function.

Village of Belle Terre v. Boraas, *supra* 416 U.S. at 8, 94 S.Ct. at 1540.

Fundamental to our reasoning is the fact that we are dealing with education, an area in which "[s]chool authorities are traditionally charged with broad power to formulate and implement educational policy . . . ." Swann v. Board of Education, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971).[9] We are also cognizant of the wisdom of Mr. Justice Holmes' statement in Missouri, Kansas & Texas Ry. Co. v. May, 194 U.S. 267, 24 S.Ct. 638, 48 L.Ed. 971 (1904), where he observed:

> When a state legislature has declared that, in its opinion, policy requires a certain measure, its action should not be disturbed by the courts under the 14th Amendment, unless they can see clearly that there is no fair reason for the law that would not require with equal force its extension to others whom it leaves untouched.

*Id.* at 269, 24 S.Ct. at 639.

This parietal rule and its challenged classification are directed toward a permissible objective. The classification is not based on any patently invidious basis. We conclude that the rule is reasonable and not arbitrary and that it "bears a rational relationship to a permissible state objective." *See* Village of Belle Terre v. Boraas, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974); Johnson v. Robison, 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974); McGinnis

v. Royster, 410 U.S. 263, 93 S.Ct. 1055, 35 L.Ed.2d 282 (1973). We find this test to be met here. *Accord,* Pratz v. Louisiana Polytechnic Institute, 316 F.Supp. 872 (W.D.La.1970), appeal dismissed, 401 U.S. 951, 91 S.Ct. 1186, 28 L.Ed.2d 234, aff'd, 401 U.S. 1004, 91 S.Ct. 1252, 28 L.Ed.2d 541 (1971); Poynter v. Drevdahl, 359 F.Supp. 1137 (W.D.Mich.1972).

The judgment of the district court is reversed and the cause is remanded to the district court to enter judgment in favor of the defendants Dr. Richard Bowen and A. L. Schnell. The district court shall dismiss the complaint against the University of South Dakota and the Board of Regents for lack of jurisdiction.[10]

**9.** See Mr. Justice Powell's observation in San Antonio School District v. Rodriquez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), where the property tax base of the school system was attacked as a denial of equal protection. The Court reasoned:
Education . . . presents a myriad of "intractable economic, social, and even philosophical problems." . . . The very complexity of the problems of financing and managing a statewide public school system suggests that "there will be more than one constitutionally permissible method of solving them," and that, within the limits of rationality, "the legislature's efforts to tackle the problems" should be entitled to respect.
*Id.* at 42, 93 S.Ct. at 1301.

