George EISCHEN, Plaintiff and Appellant,

v.

MINNEHAHA COUNTY, Lester Hawkey, Richard Schmitt and Hubert Benz, Individually and in their Respective Official Capacities, Defendants and Appellees.

No. 14491.

Supreme Court of South Dakota.

Considered on Briefs Oct. 23, 1984.

Decided Feb. 20, 1985.

John N. Gridley III, Sioux Falls, for plaintiff and appellant.

Laird Rasmussen of Moore, Rasmussen, Sabers & Kading, Sioux Falls, for defendants and appellees.

WUEST, Acting Justice.

This appeal involves an action for damages for the alleged violation of appellant's civil rights under 42 U.S.C. § 1983 (1981). A jury trial was held on December 20, 1983. At the close of appellant's case, the trial court granted a defense motion for directed verdict. We affirm.

In reviewing a directed verdict, this court views the evidence in a light most favorable to the non-moving party and gives that party the benefit of all reasonable inferences. *Cox v. Brookings Intern. Life Ins. Co.*, 331 N.W.2d 299 (S.D. 1983). A verdict is properly directed when there is no question for the trier of facts and where all reasonable men must agree that there has been an essential failure of proof to establish a prima facie case against the defendant. *Thorstenson v. Mobridge Iron Works Co.*, 87 S.D. 358, 208 N.W.2d 715 (1973).

On Saturday, September 13, 1980, George Eischen (appellant) received a form letter from the Minnehaha County Sheriff's Department (Department) stating that a warrant had been issued for his arrest for failure to pay a traffic fine. The letter informed appellant that his bond had been set at $47.00, and that he could bring or mail the bond in the form of cash, money order or cashier's check to Department. The letter further informed appellant that if he did not comply with its terms he would be arrested. This form letter was routine procedure by Department prior to executing arrest warrants for traffic offenses. Appellant called the Minnehaha County Public Safety Building to obtain additional information concerning the letter and was told by an unidentified individual that he could come there that day and pay the bond or wait until the following Monday.

Appellant elected to go to the Public Safety Building that day, where he showed the letter to an officer and stated that he

had come to take care of the matter. He was directed to Department, where he met an officer who asked for the $47.00 bond in cash. Appellant was unable to comply with the officer's request as he had only brought his personal checkbook. Appellant was informed by the officer that the officer could not accept anything other than cash. At this point, the officer showed appellant the warrant, placed him under arrest, and began filling out forms. Appellant stated that he could obtain the money if he was allowed to make a telephone call. The officer, however, told him that certain procedures were required before he was allowed to call. Thereafter, appellant's personal effects were inventoried, and he was asked to remove his shoes. He signed a "booking" card and was informed that he could make the call. At appellant's request, the officer dialed the number of a friend, remaining on the line to explain the bonding procedure, and stress that the matter was no joke. Appellant was placed in a holding area until his friends arrived with the $47.00 cash bond, at which time he was released. The incident in the Department lasted approximately one hour and five minutes.

Appellant alleges violation of his civil rights under 42 U.S.C. § 1983, claiming: (1) That he was denied equal protection of the laws by Department; (2) Department abused its authority in arresting him; and (3) the monitoring of his phone conversation constituted pre-conviction punishment. In granting a defense motion for directed verdict at the close of appellant's case, the trial court ruled that, inasmuch as appellant voluntarily presented himself to Department, the evidence viewed in a light most favorable to him did not show that the officers involved failed to follow the procedures that were set forth. We agree.

■ To establish a right to relief under 42 U.S.C. § 1983, appellant must allege facts which show: (1) That he had been deprived of a right, privilege, or immunity secured by the Constitution and laws of the United States; and (2) that the appellees deprived him of such right, privilege, or immunity while acting under color of state law or authority. *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978); *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Coffy v. Multi-County Narcotics Bureau*, 600 F.2d 570 (6th Cir.1979); *Siene v. Beresford Sch. Dist., No. 61-2, Etc.*, 425 F.Supp. 1389 (D.S.D.1977).

■ Appellant contends, inter alia, that Department denied him the right to equal protection of law by refusing his personal check, because it treated him differently than those who mailed checks to satisfy traffic offense warrants. Apparently, Department had accepted some personal checks received through the mail, although the warrant required cash, and the form letter specified cash, money order or cashier's check. Department was acting as a conduit for the office of the Minnehaha County Clerk of Courts (Clerk), who decided whether or not a check would be accepted. Equal protection of law requires that the rights of every person must be governed by the same rule of law under similar circumstances. *City of Aberdeen v. Meidinger*, 89 S.D. 412, 233 N.W.2d 331 (1975); *State v. King*, 82 S.D. 514, 149 N.W.2d 509 (1967). The equal protection test to be applied in this case is that for non-suspect classifications. When a non-suspect classification is involved, any rational basis may be sufficient to justify the classification under the equal protection clause. *Prostrollo v. University of South Dakota*, 507 F.2d 775 (8th Cir.1974), *citing Johnson v. Robison*, 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974); *McGinnis v. Royster*, 410 U.S. 263, 93 S.Ct. 1055, 35 L.Ed.2d 282 (1973); *Railway Express Agency v. New York*, 336 U.S. 106, 69 S.Ct. 463, 93 L.Ed. 533 (1949). As the trial court noted, appellant's voluntary appearance at Department is a circumstance quite different from that of the officers going to his home and taking him into custody. Moreover, Department's refusal of his tender of a personal check to pay the $47.00 bond is a

situation factually distinguishable from the acceptance of personal checks through the mail. Indeed, several rational bases exist for treating these circumstances differently. The record in this case indicates that the Clerk did not allow Department to accept personal checks and that the decision to accept such instruments through the mail was ultimately made by the Clerk. Furthermore, if Department accepted appellant's personal check, it may have either been returned for insufficient funds, rejected by the Clerk, or subjected to a stop-payment order. While the same may be said for personal checks sent through the mail, the fact that appellant was in custody, thus saving the time and expense of locating and transporting him to the Public Safety Building, provides another rational basis for the distinction. Also, in the case of an insufficient funds check, valuable court time would be used inasmuch as another warrant would have to be issued for appellant's arrest.

Appellant cites *Lessman v. McCormick*, 591 F.2d 605, 611 (10th Cir.1979) which holds that "an arrest which might be lawful on its face can be an abuse of power, condemned by the Civil Rights Act, if done for an improper purpose." The court held that appellant Lessman stated a cause of action under section 1983 even though appellant had been arrested on a valid warrant for an overtime parking violation that had not been paid. The present case is distinguishable from *Lessman*. There, the improper purpose alleged was that the police had arrested Lessman in order to intimidate her into paying a bank debt, and not for any law enforcement purpose. The record in the instant case indicates no personal animus toward appellant by the officers involved, nor do the facts evince a showing of any "improper" purpose. Appellant was arrested pursuant to a valid bench warrant executed without question or hesitation.

"Constitutional rights are shaped by the particular interest sought to be protected." *Henry v. City of Minneapolis,* 512 F.Supp. 293, 296 (D.Minn.1981), *citing Carey v. Piphus,* 435 U.S. 247, 254, 98 S.Ct. 1042, 1047, 55 L.Ed.2d 252, 259 (1978). The record shows that appellant was held by the Department for approximately one hour. Although "the concept of 'liberty' guaranteed by the Fourteenth Amendment [certainly] denotes freedom from bodily restraint. *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, [626,] 67 L.Ed. 1042, [1045,] (1923). Perhaps, however, not all unlawful deprivations of liberty were intended to be protected under § 1983." *Lessman,* 591 F.2d at 609. In *Baker v. McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979), a civil rights action brought against a sheriff for false imprisonment, plaintiff was arrested pursuant to a valid warrant and detained in jail for three days despite his protests of mistaken identity. The Supreme Court stated:

> The Fourteenth Amendment does not protect against all deprivations of liberty. It protects only against deprivations of liberty accomplished "without due process of law." A reasonable division of functions between law enforcement officers, committing magistrates, and judicial officers—all of whom may be potential defendants in a § 1983 action—is entirely consistent with "due process of law."

443 U.S. at 145, 99 S.Ct. at 2695, 61 L.Ed.2d at 442.

■ "Cases involving cognizable claims under section 1983 typically involve harsh treatment of detained individuals, detention without warrant or arraignment, or other similar egregious behavior on the part of government officials." *Henry, supra* at 297, *citing Wells v. Ward,* 470 F.2d 1185, 1188, n. 3 (10th Cir.1972). *See, e.g., Terket v. Lund,* 623 F.2d 29, 31, n. 1 (7th Cir.1980); *Hall v. Tawney,* 621 F.2d 607 (4th Cir. 1980); *Sami v. United States,* 617 F.2d 755 (D.C.Cir.1979). In *Wells,* the court refused to find a cause of action under section 1983 where a student ticketed for a traffic offense refused to sign the ticket and attempted to drive away. He was taken into custody, handcuffed, transported ten miles to a justice of the peace, not allowed to make bond on an American Automobile As-

sociation bond card, and kept in a cell for over an hour. The *Wells* Court pointed out that section 1983 requires a deprivation of constitutional magnitude and that "[i]t does not follow that all invasions, however trivial or frivolous, serve to activate remedies under the due process clause of the Fourteenth Amendment as well as those parts of the Bill of Rights which are incorporated in and made a part of due process." *Id.* at 1187–88. The court held that "in the final analysis this incident falls short, not only because the officer acted in accordance with local law ... but also because the case is insubstantial." *Id.* at 1189. *See also Brown v. Bigger*, 622 F.2d 1025 (10th Cir. 1980); *Atkins v. Lanning*, 556 F.2d 485 (10th Cir.1977); *Bennett v. Passic*, 545 F.2d 1260 (10th Cir.1976). The facts in the instant action show no "harsh treatment" of appellant, nor any "similar egregious behavior" by Department. Moreover, appellant was detained for a relatively short period of time pursuant to a warrant, the validity of which was never questioned. Under these circumstances, we believe that the deprivation of appellant's liberty was not of such a substantial constitutional magnitude as to warrant a cause of action under section 1983.

▮ Appellant further contends that the decision to refuse the personal check tendered by him at the Public Safety Building was a matter of custom or conscious policy on the part of the Department. It is well-settled that custom for the purpose of a section 1983 action must have the force of law by virtue of "persistent practices" of state officials. *Monell v. Dept. of Soc. Serv. of City of N.Y.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Adickes, supra; Lodermeier v. City of Sioux Falls*, 458 F.Supp. 1202 (D.S.D.1978); *Ellingson v. Sears, Roebuck & Co.*, 363 F.Supp. 1344 (D.S.D.1973). The record in the instant case does not show that the actions by the officers involved constituted persistent practices rising to the level of "custom" as that term is used in section 1983 actions. As a factual matter, the form letter advised appellant the bond had to be cash, a money order, or cashier's check, and as previously stated, Department was acting as a conduit for the Clerk's Office who decided whether or not a check would be accepted.

We find no merit to appellant's claim of pre-conviction punishment by the officer monitoring appellant's telephone call, which was disputed by the officer, although we view the evidence in a light most favorable to the appellant since he was the non-moving party.

We believe that the trial court properly directed a verdict in favor of appellees.

Accordingly, the trial court's judgment is affirmed.

FOSHEIM, C.J., and MORGAN, J., concur.

WOLLMAN, J., concurs specially.

HENDERSON, J., dissents.

WOLLMAN, Justice (concurring specially).

Although I am troubled by the manner in which the personnel at the Minnehaha County Sheriff's Department reacted to appellant's request for an opportunity to secure the cash needed to satisfy the bond set forth on the bench warrant, I am compelled by the record to agree with the majority that appellant failed to establish a jury question on his claim that he had been deprived of any of his civil rights. Had appellant been able to establish that in one or more instances the Department had accepted personal checks in satisfaction of the bond requirement from individuals who had presented themselves at the Department, then appellant may very well have made out a prima facie case of denial of equal protection of the law. As it is, I agree with the majority opinion that the Department acted only as a conduit for the clerk of courts when it transmitted to the clerk's office those personal checks that the Department had received through the mail. The record, even when read in the light most favorable to appellant's claims and even after drawing every possible reasonable inference from the testimony, sim-

ply does not raise a jury question on the equal protection claim. I agree fully with the majority opinion that appellant made out no claim with respect to his allegations that the Department abused its authority in arresting him and that it violated his rights in monitoring his phone call.

That said, however, I am still left with the nagging feeling that had Department personnel exercised even a modicum of discretion in this matter this law suit would never have come to pass. In a word, had appellant been permitted to make a phone call to his friend without first having to go through the booking procedure, which included his being required to remove his shoes and sit in a holding area, this whole dispute would never have arisen.

I suppose that it ill-behooves those of us in the judicial branch to offer gratuitous advice to those charged with the responsibility of administering law enforcement procedures. On the other hand, it seems to me that this case is a classic example of overly rigid adherence to what all would concede to be necessarily established, routinized procedures. The Department's actions exemplify what Professor Fiss has termed "bureaucratic pathology."

> There is a strong tradition in sociology, associated with the work of Max Weber, that identifies bureaucracy with rule-governed behavior: A Weberian bureaucrat is an official governed by a rule that prohibits him from taking into account individual circumstances. According to this tradition, the bureaucratic pathology is excessively rigid behavior, which in turn stems from the obligation of the bureaucrat to adhere to the general rules that define the powers and duties of his office.

Fiss, "The Bureaucratization of the Judiciary," 92 Yale L.J. 1442, 1450 (1983) (footnote omitted).

One wonders what would have happened had Sheriff Hawkey been present at the front desk when appellant arrived with his letter. I would like to think that in the exercise of his managerial discretion Sheriff Hawkey would have concluded that no great threat would be presented by letting this 75-year-old man make a phone call to his friend without first having to go through the formal booking procedures that are admirably suited for, and no doubt required by, the exigencies of dealing with felons and other assorted aggravated scofflaws.

What follows from these musings? Perhaps nothing. One would hope, however, that not all law enforcement departments have become so depersonalized that they cannot at times exercise circumstantial civility.

HENDERSON, Justice (dissenting).

This is the story of an old man, a parking ticket, and a cell. It is a sad story.

It is a story of an old, retired farmer who went to the sheriff's department, responding to a letter, to pay a parking ticket.[1] Because he had a check, and only $15.48 cash in his pocket, he was locked in a cell. He expressed that he would go get the balance in cash, but the tough law enforcement officer said no. Upon trying to telephone his friends for help, the tough law enforcement officer monitored the telephone call, interrupted two conversations therein, and caustically cracked: "This is no joke, we mean business!" He was searched, locked in a cell, and his shoes taken from him. It was cold on his feet as there was a tile floor. He was 76 years of age and suffered arthritis in the lower

---

1. The parking ticket was apparently issued as a result of his wife parking in a handicap zone at the "Empire Mall." However, the citation was made out to him. A letter, Exhibit 1, invited a phone call to the sheriff's department, listing 335–4300 as its number and specified that his "bond" was set at $47.00; that he could post bond in the form of a cashier's check, money order, or cash. He called upon receipt of the letter wanting to take care of the "deal" and said "I'll be right down." Three officers testified that the policy was not that citizens had to immediately come down but all citizens were accorded a reasonable time which meant several days to a week on petty offenses. This was a petty offense.

limbs which was visible to the untrained eye. This did not happen in Vladivostok nor in Leningrad. It happened in Sioux Falls, South Dakota, U.S.A. Ostensibly, we live in the land of the free and the home of the brave. Outraged, and believing in the decency of this country and the justice in its courts, he took his case before a jury for damages, based upon a violation of his civil rights. 42 U.S.C. § 1983.[2] However, the case was dismissed by the trial court upon what lawyers term a motion for directed verdict and he was thus precluded from ever having his case meritoriously determined by a jury of his peers. To this manner of treatment and adjudication of justice, I join in his outrage, uphold his cause, and accordingly dissent.

Lest the intelligentsia (God bless their lofty towers and pseudo-wisdom) cry to the heavens that outrage does not beget cold, calculated reasoning, let us expound on the law. Before doing so, I am reminded of Justice Oliver Wendell Holmes' observations that ofttimes, a good appellate judge has to have "a little fire in the belly."

This retired farmer brought this action for damages in a state court for a violation of his civil rights under 42 U.S.C. § 1983. The state court has concurrent jurisdiction with federal courts pertaining to actions for violation of civil rights. *Dickerson v. Warden, Marquette Prison*, 99 Mich.App. 630, 298 N.W.2d 841 (1980); *Brown v. Pitchess*, 13 Cal.3d 518, 531 P.2d 772, 119 Cal.Rptr. 204 (1975). Minnehaha County was sued in its corporate capacity. Minnehaha County can properly be a party defendant in a civil rights action. *See Knight v. Carlson*, 478 F.Supp. 55 (E.D.Cal.1979). *See also*, SDCL 7–12–11 and SDCL 7–12–26, both pertinent statutes for the reasons so expressed therein, i.e., a county is re-

sponsible for the payment of any judgment rendered against its sheriffs or deputies and a sheriff in this state is responsible, by statute, for the acts of his deputies and jailers.[3] A sheriff's vicarious liability under the Civil Rights Act for acts of his deputy is controlled by state law. *Tuley v. Heyd*, 482 F.2d 590 (5th Cir.1973). Sheriff Hawkey was called to the stand and testified that no internal arrest report was filed by his deputies and this violated the arrest procedures and policy within his department. He also testified that there was a definite policy established within the sheriff's department concerning bench warrants on traffic offenses and parking violations. He testified: "Those warrants we generally sent a letter out on. Since the offense was minor, we would send a letter asking the people to come in and take care of the bench warrant. And a certain percentage we did—certain percentage we had to go out and find." Deputy Sheriff Schmitt testified that he was in charge of the warrant division of the sheriff's department and that the standard procedure for a warrant on a parking ticket (even though they had a warrant) was to "send a letter to them." It was characterized as an economy move. There was testimony by Deputy Schmitt that the clerk's office accepted personal checks by mail. During this trial, this colloquy took place between counsel for the plaintiff and Deputy Schmitt:

Q. Now, when someone would send you through the mail in response to a letter such as Exhibit 1 a personal check, I take it that the response of your office at that time was to send a car out, a deputy arrests them on the spot, is that right?

A. No.

Q. You'd accept the personal check?

---

**2.** 42 U.S.C. § 1983 provides:
  Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action

at law, suit in equity, or other proper proceeding for redress.

**3.** A thrust of 42 U.S.C. § 1983 is to prohibit the deprivation of civil rights under color of state law by the protection of citizens against misuse of power by officials such as the police [law enforcement officers]. *Lessman v. McCormick*, 591 F.2d 605, 609 (10th Cir.1979).

A. In the mail, yes, we did.

Q. Did you ever go out and arrest somebody because they sent you a personal check?

A. Only on a check that would have bounced. But then we would have gotten another warrant from the court and the notation would have been paid fine with non-sufficient funds.

That Minnehaha County has been stripped of its governmental corporate immunity, whether acting in good faith or not, there is no doubt. *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673, *reh'g denied*, 446 U.S. 993, 100 S.Ct. 2979, 64 L.Ed.2d 850 (1980). When a policy is established such as it was here, the sheriff's office must treat all parties, similarly circumstanced, alike. *Royster Guano Co. v. Virginia*, 253 U.S. 412, 40 S.Ct. 560, 64 L.Ed. 989 (1920). Redress for denial of equal protection is available under 42 U.S.C. § 1983. *French v. Heyne*, 547 F.2d 994 (7th Cir.1976). When the execution of a policy is developed and implemented by another, and this results in a constitutional deprivation, then the one developing the policy is also liable. *Monell*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611. *Bradford v. Edelstein*, 467 F.Supp. 1361 (S.D.Tex.1979), also stands for this proposition. In *Owen*, 445 U.S. at 651–52, 100 S.Ct. at 1416, 63 L.Ed.2d at 694, it is stated:

> The knowledge that a [county] will be liable for all of its injurious conduct, whether committed in good faith or not, *should create an incentive for officials who may harbor doubts about the lawfulness of their intended actions to err on the side of protecting citizens' constitutional rights.*[4] Furthermore, the threat that damages might be levied against the [county] may encourage those in a policymaking position to insti-

tute internal rules and programs designed to minimize the likelihood of unintentional infringements on constitutional rights. Such procedures are particularly beneficial in preventing those "systemic" injuries that result not so much from the conduct of any single individual, but from the interactive behavior of several government officials, each of whom may be acting in good faith. (Emphasis supplied; footnotes omitted.)

Appellees' brief reeks of good faith immunity as a matter of law. This is not well taken. Good faith is an affirmative defense and the defendant bears the burden of pleading and proving same. *See Harris v. Pirch*, 677 F.2d 681, 686 (8th Cir.1982); *Landrum v. Moats*, 576 F.2d 1320, 1329 (8th Cir.1978), *cert. denied*, 439 U.S. 912, 99 S.Ct. 282, 58 L.Ed.2d 258 (1978). "Because good faith is dependent on motivation and conduct of the defendant as established at trial, the validity of the defense is ordinarily a question for the jury." *Landrum*, 576 F.2d at 1329 (citations omitted). The trial court took the position, when granting the directed verdict at the close of appellant's case, that appellant had surrendered himself to an arrest. This was based upon an assumption which I believe to be erroneous. Following is the colloquy when appellant's case was directed out of court:

> THE COURT: I think I'd feel differently about this case, Mr. Gridley, if Mr. Eischen hadn't voluntarily presented himself to the Sheriff's Department in connection with this letter. I think he did so, and after that time the evidence viewed in a light most favorable to you does not show that the officers or any of the deputies failed to follow the procedures that were set forth.
>
> I'm going to grant the motion for a directed verdict made by Mr. Rasmussen.
>
> MR. GRIDLEY: Your Honor, I don't recall any testimony—maybe I missed it

---

4. Would it not be in keeping with the spirit of the Revolutionaries who "dissolve[d] the political bands" and repudiated "absolute tyranny" of the King of England (Declaration of Independence, July 4, 1776), to adopt this compelling message in South Dakota?

from Mr. Eischen—that he voluntarily surrendered himself to the Sheriff. He went down there to find out what was going on.

THE COURT: Those circumstances are different than the officers had come out to his house and taken him into custody and taken him down to the Center. He himself voluntarily presented himself to the Public Safety Building, and *I assume* that means he surrendered himself to the custody of the Sheriff in that instance. And *I know there is no testimony about that, but it seems to me it's implicit* in what happened here that that is the situation.

I'm going to grant the defendants' motions, or each of the defendants' motions, for a directed verdict in this case and send the jury home. I will sign the appropriate order and judgment, Mr. Rasmussen, if you will present it. (Emphasis supplied.)

There was a question of fact for this jury, as I will detail below.

The purpose of the Federal Civil Rights Act is to create a right of action, enforceable in federal courts, against those who, under color of state law, deprive any person of any rights, privileges, and immunities guaranteed by the Federal Constitution and laws. *Marland v. Heyse*, 315 F.2d 312 (10th Cir.1963). In *Marland*, a directed verdict as to all defendants, like here, was appealed by the plaintiff. The question in *Marland*, like here, was whether or not the conduct of the law enforcement officers was so arbitrary and unreasonable as to subject plaintiff to a deprivation of rights guaranteed by the Constitution of the United States. It was held that under the facts of that case, a jury question was so presented and that it was error to direct a verdict against the plaintiff. This is the only case involving a motion for directed

verdict that my research developed. Although the facts here are not so aggravated as in *Marland,*[5] still there is a question of fact for the jury. There was telephonic eavesdropping by the tough law enforcement officer in both conversations which appellant had with a husband and wife team he had called for help; the officer interrupted each conversation when the Sioux Falls couple attempted to help their aged friend; upon arrival by this couple with the $47.00 bail money, the tough law enforcement officer would not immediately release appellant. (Refusing bond money and shutting an old, arthritic man away from the world in a cell, without his shoes, is the type of civil rights violation forbidden by 42 U.S.C. § 1983.) In fact, the officer stalled and kept appellant in the cell for an additional period of one-half hour to 45 minutes. Irked, and worried about this aged man, Mrs. Elrod (his friend) confronted the officer and asked: "What is the matter? We're here to get George Eischen out. We've got the money. What's the delay?" His reply: "Oh, he has to be mug shot and fingerprinted." The record does not suggest that this was ever done. When appellant was released, he was described in testimony as being nervous, upset, and "down in the mouth." Appellant then and there expressed to his two friends: "I never been in anything like that in my life. This is humiliation."

A jury trial is a precious right.[6] It is the duty of a trial judge to instruct the jury on matters of law, framed by the pleadings and evidence in the case. Where an issue is removed from the jury's consideration, the Supreme Court must view the evidence in a light most favorable to the party presenting the issue. *Moor v. Iowa Mfg. Co.*, 320 N.W.2d 927 (S.D.1982). The jury separates us from the totalitarian cultures. Questions of fact should be resolved by a jury. A case should not be taken from the

---

5. The officers here did have a bench warrant.

6. S.D.Const. art. VI, § 6, provides:
   The right of trial by jury shall remain inviolate and shall extend to all cases at law without regard to the amount in controversy, but the Legislature may provide for a jury of less than twelve in any court not a court of record and for the decision of civil cases by three-fourths of the jury in any court.

jury when reasonable persons could differ as to the resolution of the factual questions. *DeBerg v. Kriens*, 82 S.D. 502, 149 N.W.2d 410 (1967). Appellant should be given an opportunity to present his case to a jury. "The proper method of submitting a case to the jury is by a clear and precise statement of those issues which find support in the evidence." *Dwyer v. Christensen*, 77 S.D. 381, 387, 92 N.W.2d 199, 203 (1958). Through its combined wisdom, it is best equipped to evaluate and decide his case. The trial judge, in my opinion, based his entire ruling on an assumption of fact, namely, that George Eischen went to the sheriff's department to surrender himself. Nothing could be further from the factual setting. The letter does not suggest such a situation. George Eischen's telephone call on a Saturday morning does not warrant such an assumption. A policy that existed at that time was to not arrest citizens for voluntarily paying their parking tickets. Thus, the trial court should have permitted the jury to gage the credibility of the witnesses and weigh the evidence. *Bogh v. Beadles*, 79 S.D. 23, 107 N.W.2d 342 (1961). The credibility of the witnesses was something for the jury to decide, not the trial court. When there is competent evidence in the record, the trial court must present those issues to the jury by instruction. *Ebert v. Fort Pierre Moose Lodge # 1813*, 312 N.W.2d 119 (S.D.1981); *Wolf v. Graber*, 303 N.W.2d 364 (S.D.1981); *Olesen v. Snyder*, 277 N.W.2d 729 (S.D.1979). The policy was established by the sheriff's department together with the clerk's office acting in consort, of not arresting people on traffic warrants and allowing personal checks to be used to satisfy them. George Eischen was treated differently than anyone else. The transcript of this trial vividly illustrates this point. Sheriff Hawkey and Deputy Schmitt were the policymakers. The sheriff approved of this form letter which was used on warrants for parking violations. Deputy Schmitt was the head of this warrant division, signed this letter, and supervised its distribution through the United States mail. Deputy Benz was the officer who deprived appellant of his liber-

ty. It is the violation of the policies of the clerk's office, the sheriff's department, and Minnehaha County which constitutes and creates a constitutional deprivation of appellant's rights. "No state shall make or enforce any law which shall ... deprive any person ... within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1, para. 1. Fourteenth Amendment violations are definitely within the purview of 42 U.S.C. § 1983. *Memphis v. Greene*, 451 U.S. 100, 101 S.Ct. 1584, 67 L.Ed.2d 769 (1981).

We must now examine our own state law concerning motions for directed verdict. The trial court owes a duty to accept the evidence in a light most favorable to the party against whom the motion is sought. Moreover, the trial court owes another duty: to indulge in all legitimate inferences in favor of that evidence and the party against whom the motion is sought which can be fairly drawn therefrom. Our review on this Court of a motion for directed verdict is the same approach as the trial court. *Budahl v. Gordon & David Assoc.*, 323 N.W.2d 853 (S.D.1982); *Ebert*, 312 N.W.2d 119. Inferences from the evidence are important. *Degen v. Bayman*, 90 S.D. 400, 241 N.W.2d 703 (1976). The nonmoving party is entitled to inferences and assumptions from the evidence, not the moving party, on a motion for directed verdict. Here, as I pointed out above, the inferences and assumptions were made in favor of the moving party and against the nonmoving party, George Eischen.

The tough law enforcement officer had no right to monitor appellant's call. This was a petty offense, appellant was an elderly man and was simply calling to elicit the immediate aid of a friend. He was not a convict and he had not been convicted of anything and he was under no sentence. He was entitled to be accorded civility and respect. That this telephone monitoring constituted a constitutional transgression, *see Jones v. Wittenberg*, 330 F.Supp. 707, 719 (D.C.N.D.Ohio 1971); *Jones v. Wittenberg*, 323 F.Supp. 93 (D.C.N.D.Ohio 1971). Appellant was going to the sheriff's office

in response to a letter—in response to a policy—in an attempt to simply take care of this petty offense. As he testified, he got the letter, made a telephone call immediately, and told the sheriff's department that he wanted to come down and take care of the "deal." There was nothing to suggest in the telephone conversation between this elderly man and the sheriff's department that he was going to the sheriff's department to be arrested and thrown in a cell. And the gravamen of the wrong is that he was denied equal protection of the law by a zealous officer who decided to get rough on an old, arthritic man and who forsook the existing policy of the sheriff's department. Appellees have not provided any rational relationship to a legitimate state purpose in the difference in treatment accorded to George Eischen as compared to any other citizen contacted by the sheriff's department on a similar warrant who sent in a personal check. The warrant is a camouflage for the terrible wrong here perpetrated. It is being used as a shield to cover up a shame of enormity. Letters were used to bring in the public even though warrants were held for parking violations. George Eischen was entitled to equal protection of the law, in that the rights of every person must, out of a sense of fairness, be governed by the same rule of law for like circumstances. There is not one scintilla of evidence in this record to suggest that there were other citizens arrested and jailed, who affirmatively responded to cooperate, such as George Eischen did when he received his letter.

Therefore, this case should be reversed and remanded to the trial court so that a jury of his peers may fairly determine the right and wrong, in law, of this case. In tort law, not unlike others who have passed through these portals seeking damages for a wrong, George Eischen joins the Legion Lost. Penning my note of discord, a refrain comes to me: "And crown thy good with brotherhood from sea to shining sea." A phrase comes to me: "We, the people. . . ." A little old lady's words to Benjamin Franklin, as he departed from the constitutional convention, comes to me: "Sir, what kind of government did you give us?" And his quick retort brightens the small crowd: "A republic, madam, if you can keep it." Yes, in the land of the free, where has the freedom gone? *See Sequel, State v. Maves,* 358 N.W.2d 805, 812 (S.D. 1984) (Henderson, J., dissenting). Republic keepers wanted. Henderson, J.