2003 SD 8

**Duane SWEDLUND and Ruth Swedlund, Plaintiffs and Appellees,**

v.

**Greg FOSTER, individually and in his official capacity as Custer County Sheriff; Roy Scherer, individually; Dan Engen, individually; Dave Baker, individually; Mike Rivers, individually; Jim Biesheuvel, individually; and Custer County, Defendants and Appellants.**

No. 21870.

Supreme Court of South Dakota.

Argued March 25, 2002.

Decided Jan. 15, 2003.

Rehearing Denied Feb. 20, 2003.

Glen H. Johnson, Michael C. Loos of Johnson Eiesland Huffman and Clayborne, Rapid City, South Dakota, Attorneys for plaintiffs and appellees.

Donald P. Knudsen, James S. Nelson of Gunderson, Palmer, Goodsell and Nelson, Rapid City, South Dakota, Attorneys for defendants and appellants.

GORS, Acting Justice.

[¶ 1.] Duane and Ruth Swedlund (Swedlunds) sued Custer County Sheriff Greg Foster and five deputy sheriffs. Swedlunds claimed the law enforcement officers violated their civil rights under 42 U.S.C. § 1983. Swedlunds also brought state law tort claims for assault and battery, intentional infliction of emotional distress, false arrest, false imprisonment and trespass. The officers moved for summary judgment, claiming they were entitled to the protection of qualified immunity on Swedlunds' § 1983 claims and common law immunity on Swedlunds' state law tort claims. The trial court denied the motion. This Court granted the officers' petition for permission to take an intermediate appeal. We affirm.

## FACTS AND PROCEDURE

[¶ 2.] Mike Tennyson (Tennyson) told Custer County Sheriff Foster (Foster) that he suspected Anita Swedlund (Anita) was embezzling money from his business. Foster assigned Deputy David Baker (Baker) to investigate, and Baker and Tennyson met the next day. Based on their conversation, Baker surmised that several missing checks from Tennyson's business might be found at the residence of Anita and her husband Lowell (hereinafter "Lowell and Anita's house"). Tennyson, who lived in the same area as Anita, supplied Baker with her rural route address and described Lowell and Anita's house as a grey two story farm house. Baker then verified the rural route box number with the post office.

[¶ 3.] With this information, Baker prepared an affidavit and request for a search warrant and submitted it to a circuit judge, who issued a warrant on August 1, 1999, to search Lowell and Anita's house. The search warrant provided the address and description of Lowell and Anita's house as follows: "RR1 Box 61D, Custer, SD 57730, Wind Song Valley Rd. A grey two story farm house."

[¶ 4.] Before executing the warrant, Foster sent Deputies Roy Scherer (Scherer) and Mike Rivers (Rivers) to locate ("scout") and photograph Lowell and Anita's house because Sheriff Foster wanted to make sure they had the right house. Deputy Dan Engen (Engen), who had previously been to Anita's house, gave Scherer the following directions: "You go down the road, down Wind Song Valley Road, and follow it to the end where it takes a sharp right. His house, Lowell Swedlund's house, is right on the corner. You can't miss it." They did.

[¶ 5.] The deputies did not take Wind Song Valley Road to the end where it takes a sharp right. Before they reached the end of the road, the deputies noticed a sign bearing the name "Swedlund" and a house in the distance. However, trees obscured the view of the house from where they parked their car. Nevertheless, the deputies concluded that they were at the right address and took photographs of the house from their parked vehicle. When developed, the photographs showed only trees and part of a door. Scherer, Engen and Biesheuvel later testified that the photographs were insufficient to properly identify the house because the only objects visible were trees and the front door. At the time the officers initially looked at the photographs, however, no officers questioned whether the scout team had photographed the correct house.

[¶ 6.] The deputies took pictures of the wrong house. The house that they photographed belonged to Lyle and Ruth Swed-

lund, Lowell's parents, who lived with their forty-eight year old, mentally retarded son, Duane. Lyle and Ruth's house was a bright red A-frame house, in contrast to Lowell and Anita's house, which was described in the search warrant as a "grey two story farm house." Lowell and Anita's house is located less than a half mile away on the same road; one can see Lyle and Ruth's house from Lowell and Anita's driveway. Disputed evidence exists that some of the deputies may have actually seen Lowell outside in his own yard while they were looking for Lowell and Anita's house.[1]

[¶ 7.] Based on previous experience with Anita, Foster was concerned that there might be people at Lowell and Anita's house who would be under the influence of drugs.[2] Therefore, Foster decided to execute the warrant as a high-risk entry, using eight officers to execute the warrant. At approximately 7:40 p.m. four Custer County Sheriff Department patrol vehicles, and one Highway Patrol vehicle drove to what the officers assumed to be Lowell and Anita's house in order to search for the missing checks. As the officers drove up to Lyle and Ruth's house, Engen saw Lowell and Anita's house at the end of Wind Song Road and remarked to Biesheuvel, "There's Lowell's house right down there." Engen pointed to Lowell and Anita's house, which was visible to Biesheuvel. Engen then concluded that

Lowell must have moved. When they arrived at Lyle and Ruth's house, neither Engen nor Biesheuvel said anything about Engen's comment concerning Lowell and Anita's house being located down the road.

[¶ 8.] Biesheuvel knocked on Lyle and Ruth's door three times,[3] announced his purpose, waited and then opened the unlocked door. Duane was the only person in the house. He was sitting on a chair watching television and working on a jigsaw puzzle. With their guns drawn, the officers yelled at Duane to get down on the floor. Startled, Duane stood up from his chair and, unable to speak, started yelling and waving his arms. The officers did not know Duane was mentally retarded, and did not know why Duane would not get down on the floor. They claimed Duane's actions were consistent with someone under the influence of narcotics. Baker and Engen holstered their weapons and attempted to force Duane to the floor. Duane resisted, so Engen tried to spray Duane's eyes with pepper spray but hit Baker instead. Engen's second shot of pepper spray hit Duane right between the eyes. Duane continued to resist. The officers then physically forced Duane to his knees and placed a handcuff on one wrist. Duane managed to stand up, and Baker struck him on the right leg three or four times. Baker then forced Duane to his knees again. At this point Duane be-

1. Shortly after the officers had taken the pictures, Engen and Biesheuvel overheard a conversation between Rivers and Scherer at the Sheriff's office. According to the testimony of Engen and Biesheuvel, while out photographing Lyle and Ruth's house, Rivers and Scherer said that they saw Lowell outside in his own yard. Scherer, however, denies any such conversation.

2. Anita had been convicted of possession of cocaine several years earlier, and it was believed that Anita was involved with the drug trade in the Custer area. Foster also told the

deputies that Anita had a history of resisting arrest and could be "pretty ornery." Anita had once bitten Engen on a prior occasion while she was being arrested.

3. The officers did not tell the circuit judge who issued the search warrant that they suspected possible drug trafficking at Anita's house or that they intended to execute the search as a high–risk entry. Therefore, the judge did not issue a no–knock warrant pursuant to SDCL 23A–35–9.

gan crawling on the floor dragging several officers with him. Foster thought Duane was reaching for a pair of scissors, so Foster grabbed him by the belt and jerked him back. Duane kicked Foster in the stomach, and Foster struck Duane twice on the forearm. Duane was eventually handcuffed after a considerable struggle.

[¶ 9.] From Lowell and Anita's house, Lowell (Duane's brother) saw that several police vehicles were parked at his parents' house. Subsequently, Anita, Lowell and their daughter drove there to see what was happening. When they arrived, Lowell exited the vehicle and began asking the officers questions. Lowell was then handcuffed and put in the back seat of a patrol car. When Anita exited the car, they also handcuffed her, arrested her, and placed her in the back seat of a separate patrol car.

[¶ 10.] Meanwhile, Duane was removed from the house in handcuffs. He was red in the face and foaming at the mouth. Lowell asked why the officers were at his parents' house, and they responded that they had a warrant to search Lowell and Anita's house for missing checks. Lowell stated, "Don't you know what you're doing? Don't you know where you are at? This is my parents' house." Baker looked at the house, saw it was red, not grey, and knew they were at the wrong house. Scherer remarked, "You win some, you lose some." Foster ordered the handcuffs removed from Lowell and Duane. The officers left the premises with Anita handcuffed in the back seat of the patrol car. They never did search Anita and Lowell's house for the missing checks.

[¶ 11.] Duane and Ruth Swedlund sued Foster and five law enforcement officers[4] under 42 U.S.C. § 1983 for violating their Fourth and Fourteenth Amendment Constitutional rights and for assault and battery, intentional infliction of emotional distress, false arrest, false imprisonment and trespass. The officers moved for summary judgment, claiming that they were entitled to qualified and common law immunity. The trial court denied the motion. This Court granted permission to take an intermediate appeal. The defendants appeal on the following issues:

1. Whether the officers are afforded qualified immunity from Swedlunds' § 1983 claims.

2. Whether the law enforcement officers are protected by common law immunity from Swedlunds' state law intentional tort claims.

## STANDARD OF REVIEW

[¶ 12.] The trial court found that the officers were not protected by either qualified or common law immunity. Immunity is a legal question to be decided by the court and is particularly amenable to summary judgment. *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 536, 116 L.Ed.2d 589, 595 (1991); *Hart v. Miller,* 2000 SD 53 at 13, 609 N.W.2d 138, 143; *Horne v. Crozier,* 1997 SD 65 at 6, 565 N.W.2d 50, 52. Qualified immunity is not just a defense to liability but an entitlement not to stand trial or face the burdens of litigation. Therefore, immunity questions should be resolved as early as possible. *Horne,* 1997 SD 65 at 6, 565 N.W.2d at 52, citing *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411, 425 (1985). Otherwise, the protection of qualified immunity is effectively lost if there must be a trial to establish that no trial is necessary. *Saucier v. Katz,* 533

---

**4.** Custer County, one of the deputies and the highway patrol officers were voluntarily dis-missed from the suit.

U.S. 194, 200–01, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272, 281 (2001).

[¶ 13.] This Court's standard of review regarding a trial court's grant or denial of summary judgment is well established:

> Summary judgment is authorized "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." We will affirm only when there are no genuine issues of material fact and the legal questions have been correctly decided. All reasonable inferences drawn from the facts must be viewed in favor of the non-moving party. The burden is on the moving party to clearly show an absence of any genuine issue of material fact and an entitlement to judgment as a matter of law.

*Dakota Pork Indus. v. Huron*, 2002 SD 3, 5, 638 N.W.2d 884, 885 (internal citations omitted). Whether the officers are "shielded by sovereign immunity is a question of law, reviewed de novo, with no deference given to the trial court's legal conclusions." *Hart*, 2000 SD 53 at 11, 609 N.W.2d at 142.

## ANALYSIS AND DECISION

[¶ 14.] **1. WHETHER THE OFFICERS ARE AFFORDED QUALIFIED IMMUNITY FOR SWEDLUNDS' § 1983 CLAIMS.**

[¶ 15.] Under the Civil Rights Act of 1871 (42 U.S.C. § 1983) a party may recover damages for the " 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States caused by any person acting under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory.' " *Tri County Landfill Ass'n, Inc. v. Brule County*, 2000 SD 148 at 11, 619 N.W.2d 663, 667 (citing 24 U.S.C. § 1983). To establish a cause of action under § 1983, the plaintiff must establish the following two elements: "First, the plaintiff must allege that some person has deprived him of a federal right. Second, he must allege that the person who has deprived him of that right acted under color of state or territorial law." *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572, 577 (1980); *Hart*, 2000 SD 53 at 58, 609 N.W.2d at 150 (Amundson J., dissenting). A claim under § 1983 must be predicated on deliberate action; negligence is not enough. *Horne*, 1997 SD 65 at 12, 565 N.W.2d at 54. Even gross negligence is not enough. *Id.* at 13. A claim for violation of civil rights under 42 U.S.C. § 1983 can be brought in either federal or state court. *Eischen v. Minnehaha County*, 363 N.W.2d 199, 205 (S.D. 1985) (Henderson J., dissenting).

[¶ 16.] Sovereign immunity is not a defense to a claim under 42 U.S.C. § 1983 because civil rights violations claim an intentional tort. See *Bego v. Gordon*, 407 N.W.2d 801, 809 n. 10 (S.D.1987); *Webb v. Lawrence County*, 144 F.3d 1131, 1135 (8th Cir.1998); *Webb v. Lawrence County*, 950 F.Supp. 960, 967 (D.S.D.1996). However, police officers, under certain situations, may raise the defense of qualified immunity to avoid liability under § 1983. *Hafner v. Delano*, 520 N.W.2d 587, 591 (S.D.1994). Qualified immunity is given to officers who have made a good faith mistake. *Hart*, 2000 SD 53 at 14, 609 N.W.2d at 143; citing *Gainor v. Rogers*, 973 F.2d 1379, 1382 (8thCir.1992) ("This [qualified immunity analysis] allows ample room for a good faith mistake by the officer since his conduct must be measured in terms of the belief of a reasonable officer based upon the facts then available to the offi-

cer"); *Spenner v. City of Sioux Falls,* 1998 SD 56 at 27, 580 N.W.2d 606, 612. Qualified immunity is extended to prevent litigation and liability from inhibiting government officials from discharging their duties. *Hart,* 2000 SD 53 at 59, 609 N.W.2d at 150 (Amundson J., concurring in part, dissenting in part). The goal of qualified immunity is to avoid excessive disruption of government and permit the resolution of insubstantial claims on summary judgment. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396, 410 (1982).

[¶ 17.] The Eighth Circuit Court of Appeals employs a three-part test to determine whether an officer is protected by qualified immunity:

1. Has plaintiff claimed a violation of a constitutional right?

2. Was the constitutional right clearly established?

3. Would a reasonable officer know that the alleged actions violated the clearly established constitutional right?

*Hafner,* 520 N.W.2d at 591–92, citing *Foulks v. Cole Cnty.,* 991 F.2d 454, 456 (8th Cir.1993) (citing *Cross v. City of Des Moines,* 965 F.2d 629, 631–32 (8th Cir. 1992)); cited in *Horne,* 1997 SD 65 at 38, 565 N.W.2d at 59–60.

[¶ 18.] Recently, in Saucier, the United States Supreme Court employed a similar three-part test when analyzing qualified immunity. 533 U.S. at 201, 121 S.Ct. at 2156, 150 L.Ed.2d at 281. First: The threshold question is, "[t]aken in the light most favorable to the [plaintiff], do the facts alleged show the officer's conduct violated a constitutional right?" 533 U.S. at 201, 121 S.Ct. at 2156, 150 L.Ed.2d at 281. If the court determines that there is no violation of a constitutional right, then the inquiry stops, and the officer is entitled to qualified immunity. *Id.* Second: However, if the plaintiff can show a violation of

a constitutional right, the next, sequential step "is to ask whether the right was clearly established." *Id.* The inquiry as to whether the constitutional right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* Third: Finally, the "relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202, 121 S.Ct. at 2156, 150 L.Ed.2d at 282 (citing *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818, 830 (1999)).

[¶ 19.] The test articulated by this Court in *Hart* is similar: "To find whether qualified immunity applies, the test is to ask if the officer's conduct violated clearly established statutory or constitutional rights a reasonable officer would have known at the time." 2000 SD 53 at 13, 609 N.W.2d at 143. *Hart* also stated:

[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action, assessed in light of the legal rules that were "clearly established" at the time it was taken.

. . .

[O]ur cases establish that the right the official is alleged to have violated must have been "clearly established" in [the following] sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to

say that in light of preexisting law the unlawfulness must be apparent.

*Id.* at 14 (citing *Spenner,* 1998 SD 56 at 27, 580 N.W.2d at 612, quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523, 530–31 (1987)). We conclude that our test from *Hart,* the Eighth Circuit test and the test articulated by the United States Supreme Court in *Saucier* are essentially the same. Therefore, we will examine this case to determine (1) if Swedlunds' complaint alleged violation of their constitutional rights, (2) if the constitutional rights were clearly established and (3) if a reasonable officer would understand that what he was doing violated their constitutional rights.

**(1) Did Swedlunds' complaint allege violation of their constitutional rights by the law enforcement officers?**

[¶ 20.] The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers and effects, and against unreasonable searches and seizures. . . ." U.S. Const. amend. IV. A warrantless search and seizure is unreasonable absent probable cause and exigent circumstances. *Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639, 651 (1980). This Court has previously stated:

the fourth amendment to the United States Constitution and Article VI, § 11 of the South Dakota constitution both provide that people have the right to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. Warrantless arrests and searches, therefore, are unconstitutional, unless there is a showing by those who seek exemption from the warrant requirement that their actions were

reasonable, based on probable cause, and that the exigencies of the situation made the course imperative.

*State v. Max,* 263 N.W.2d 685, 687 (S.D. 1978). The Fourth Amendment right "to retreat into [one's] own home and there be free from unreasonable governmental intrusion" has long been established. *Silverman v. United States,* 365 U.S. 505, 511, 81 S.Ct. 679, 682, 5 L.Ed.2d 734, 739 (1961).[5] The Iowa Supreme Court eloquently declared:

A man's home is still his castle, and, although not surrounded by high-raised battlement and labored mound, thick wall, and moated gate, he is as secure therein as a baron of old in feudal castle. The constitutional guaranties and statutory inhibitions are substitutes for the physical environments and security of former days, and these guaranties and limitations must be respected by all, . . . .

*McMillan v. Osterson,* 191 Iowa 983, 183 N.W. 487, 489 (Iowa 1921).

[¶ 21.] In *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443, 454 (1989), the Supreme Court held that the Fourth Amendment limits the amount of force which an arresting officer may use. *Horne,* 1997 SD 65 at 31, 565 N.W.2d at 58. "Today we make explicit what was implicit in [*Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)], and hold that *all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment[.]" *Id.* This Court has also made it clear that all claims that law enforcement officers have used excessive force are analyzed under the Fourth Amendment's guarantee to citizens

**5.** *See also Coolidge v. New Hampshire,* 403 U.S. 443, 477–78, 91 S.Ct. at 2022, 2044, 29 L.Ed.2d 564 (1971) (holding that a search of a

home without a warrant is presumed unreasonable in the absence of exigent circumstances).

of the right "to be secure in their persons ... against unreasonable ... seizures." *Darrow v. Schumacher*, 495 N.W.2d 511, 519 (S.D.1993).

[¶ 22.] The right to be free from unreasonable searches and seizures and the right to be free from excessive force[6] are both "clearly established rights of which a reasonable official would know." *Pray v. City of Sandusky*, 49 F.3d 1154, 1158 (6th Cir.1995) (citing *Graham*, 490 U.S. at 392–93, 109 S.Ct. at 1969–70, 104 L.Ed.2d at 453 (1989)). Therefore, the Swedlunds' complaint which claimed both unreasonable search and seizure and excessive force alleged violation of their constitutional rights by the law enforcement officers.

**(2) Were the constitutional rights to be free from unreasonable searches and seizures and excessive force clearly established?**

[¶ 23.] The burden is on the Swedlunds to show that the constitutional rights to be free from unreasonable search and seizure and excessive force were clearly established statutory or constitutional rights which a reasonable officer would know. *Horne*, 1997 SD 65 at 40, 565 N.W.2d at 60; *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396, 410 (1982). "[I]n the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523, 531 (1987). A police officer should know that the Fourth Amendment and the state constitution prohibit unreasonable searches. *Horne*, 1997 SD 65 at 40, 565 N.W.2d at 60. Sheriff Foster knew that identifying the correct house was important. He testified that "scouting out"

residences prior to executing search warrants is "important" and "critical," and that "it's a safety valve to have the house scouted" to be sure they "have the right house." The deputies also knew it was important to search the right house because they conducted the reconnaissance and took pictures in an effort to make sure they had the right house. The specific constitutional right to be free from unreasonable search and to search the right house were admittedly known to the law enforcement officers so there is no question that it was clearly established.

[¶ 24.] Law enforcement officers also know that they may not use excessive force. SDCL 23A–3–5 provides in part that "No person shall subject an arrested person to more physical restraint than is reasonably necessary to effect the arrest." Use of "excessive force is impermissible even during a lawful arrest." *Horne*, 1997 SD 65 at 13, 565 N.W.2d at 54, citing *Weyant v. Okst*, 101 F.3d 845, 858 (2d Cir.1996). The specific right to be free from excessive force was clearly established. *Spenner*, 1998 SD 56 at 27–28, 580 N.W.2d at 612–13; *Pray*, 49 F.3d at 1158.

**(3) Would reasonable officers know that their alleged actions violated the clearly established constitutional rights?**

[¶ 25.] The United States Supreme Court noted in *Saucier* that the "relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." 533 U.S. at 202, 121 S.Ct. at 2156, 150 L.Ed.2d at 282. Our task then is to determine whether the summary

---

6. *See Yellowback v. Sioux Falls*, 1999 SD 114, ¶ 9, 600 N.W.2d 554, 557 ("This Court has made clear that all claims that law enforcement officers have used excessive force must be analyzed under the Fourth Amendment's right 'to be secure in their persons ... against unreasonable [searches and] seizures.' ").

judgment record shows that (1) a reasonable officer in the defendants' situation would have known that the search of Lyle and Ruth Swedlunds' house and the seizure of Duane was unlawful, and (2) a reasonable officer in defendants' position would have known that the amount of force used on Duane was excessive.

**The search of the wrong house.**

[¶ 26.] It is undisputed that the officers did not have a search warrant for Lyle and Ruth's residence when they entered the home, nor did they have probable cause to believe that any crime was taking place at their home. The officers contend that because their actions took place as a result of their mistaken belief that they were executing the search warrant on the correct house, a reasonable officer in their position would not know that their actions were violating Ruth and Duane's constitutional rights.

[¶ 27.] "The Fourth Amendment is not violated ... by the mistaken execution of a valid search warrant on the wrong premises." *Graham*, 490 U.S. at 396, 109 S.Ct. at 1872, 104 L.Ed.2d at 455 (1989). "Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances, for example, and in those situations courts will not hold that they have violated the Constitution." *Saucier*, 533 U.S. at 206, 121 S.Ct. at 2158, 150 L.Ed.2d at 284. The Fourth Amendment is only violated when there is an unreasonable mistaken execution of a valid search warrant at the wrong house. *Dawkins v. Graham*, 50 F.3d 532, 535 (8th Cir.1995).

[¶ 28.] Dawkins is a factually similar case. Dawkins, involved a mistaken execution of a valid search warrant on the wrong premises. In that case, officers were told that a suspect and his pink Camaro (an object of the search as well as the house) were both at 611 Byrd Street. *Id.* at 532. One of the officers had previously been to 611 Byrd and was personally familiar with the route. Nevertheless, the officers turned a block too soon onto Adam Street. *Id.* The only vehicle at 611 Adam was a van that was only partially pink, and the house was a different color then the one at 611 Byrd. *Id.* The officers did not check the discrepancies with the rest of the team. *Id.* Instead, the officers burst into the home with their guns drawn. They ordered the female occupants who were watching television to get down on their knees. *Id.* at 532. A teenage boy was thrown against the wall and handcuffed. Screams awoke the husband, who was then knocked to the floor by one of the officers with his gun. The husband's face bled from striking the floor. *Id.* The residents brought a § 1983 action alleging unlawful entry and arrest and excessive force. The officers moved for summary judgment based on qualified immunity. The trial court denied their motion. *Id.* at 534. The Eighth Circuit Court of Appeals affirmed, concluding, "the execution of a valid warrant on the wrong premises violates the Fourth Amendment if the officers should know the premises searched are not the premises described in the warrant, i.e., the officers' mistake is not objectively reasonable." *Id.* (discussing *Maryland v. Garrison*, 480 U.S. 79, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987)).[7] The Dawkins Court further stated:

> the law prohibiting the officers' conduct was clearly established at the time of the raid. This case involved the funda-

7. *Saucier* noted that "excessive force claims, like most other Fourth Amendment issues, are evaluated for *objective reasonableness* based upon the information the officers had when the conduct occurred." 533 U.S. at 207, 121 S.Ct. at 2159, 150 L.Ed.2d at 285 (emphasis added).

mental and long-established Fourth Amendment rights to retreat into one's own home and to be free from unreasonable governmental intrusion there. *The more specific right not to be subjected to the unreasonable mistaken execution of a valid search warrant was also clearly established at the time of the search in this case.* 50 F.3d at 535 (emphasis added) (internal citations omitted).

[¶ 29.] Courts have to be careful not to paint themselves into a corner with the qualified immunity analysis. In an effort to prevent inhibition of officials or disruption of government with lawsuits and liability, the analysis requires the plaintiff to prove deliberate misconduct or that the official was wholly incompetent. In *Davis v. Fulton County,* 90 F.3d 1346, 1352 (8th Cir.1996), the Eighth Circuit Court of Appeals concluded that "[n]egligent, or even grossly negligent, conduct by government officials cannot be the basis of a constitutional tort claim." *Id.* See also, *Horne,* 1997 SD 65 at 13, 565 N.W.2d at 54 ("[g]ross negligence in conducting an arrest is altogether insufficient to sustain an action under § 1983"). In *Saucier,* the United States Supreme Court declared that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." 533 U.S. at 202, 121 S.Ct. at 2157, 150 L.Ed.2d at 282 (citing *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). If the court finds that plaintiff proved intentional misconduct or total incompetence and denies qualified immunity, then the court has effectively directed a verdict on the merits of plaintiff's claim.

[¶ 30.] The better approach is to have the trier of fact decide when there is a genuine issue of material fact as to whether the official's conduct was objectively reasonable. Summary judgment is not appropriate where the facts are in dispute as they are in this case. Other courts have employed this approach. In *Dawkins,* the Eighth Circuit held that "[i]n these circumstances, a jury must decide whether the officers should have known they were entering the wrong house." 50 F.3d at 535. The court went on to say, "there is a material question of fact about whether the officers' entry of the Dawkins home was a mistake amounting to plain incompetence." *Id.* In another mistaken entry suit, the Second Circuit held that "Consequently, there are factual questions as to whether the officials could have had a reasonable belief that their actions with respect to the correct apartment were not in violation of clearly established law. Further, there were factual questions as to whether targeting Castro's apartment was a mistake that bespoke plain incompetence." *Castro v. United States,* 34 F.3d 106, 113 (2d Cir.1994). This Court has also previously held that when there is a question of fact essential to determination of an immunity question, it is for a properly instructed jury to decide. In *Hart,* 2000 SD 53 at 28–29, 609 N.W.2d at 146–47, there was a question of fact as to whether Trooper Miller's conduct was objectively reasonable. Chief Justice Gilbertson, writing for the majority, said:

> The trial court measured Miller's actions against a standard of objective reasonableness. On this basis, the court found that a reasonable officer in Miller's position would have believed his actions were lawful and not in violation of Hart's constitutional rights. However, it failed to focus on whether a question of fact exists as to the meaning of Miller's question to Hart and the claims of prior misconduct as interpreting the meaning of his ambiguous statement. "[I]n the light of pre-existing law the unlawfulness must be apparent." *Anderson,* 483

U.S. at 640, 107 S.Ct. at 3039, 97 L.Ed.2d at 531. While Miller could properly question a suspect when circumstances reasonably indicate it is necessary, (see *Spenner,* 1998 SD 56, at 29, 580 N.W.2d at 613), he was not at liberty to offer immunity from prosecution in exchange for sexual favors.

We reverse on this issue and remand for a trial where the jury will judge the credibility of the witnesses as to what really occurred and determine whether Miller's conduct was for a proper reason or not.

Disputed facts cannot confer qualified immunity.

[¶ 31.] In this case, there is a genuine issue of material fact as to whether the officers' actions in executing the valid search warrant at the wrong location was objectively reasonable. The following evidence could persuade a trier of fact that the search was not objectively reasonable:

1. The warrant only authorized a search of Lowell and Anita's home, not Lyle and Ruth's home.

2. Lowell and Anita's home was adequately and unambiguously described as a "grey two story farm house" in the warrant.

3. Lyle and Ruth's bright red A-frame home did not match the unambiguous description in the warrant.

4. Sheriff Foster did not send Deputy Engen, who had previously been to Lowell and Anita's home, on the scouting mission. Instead, Foster sent two officers who had never been to Lowell and Anita's house to make sure they had the right house.

5. The two officers sent to scout for the right house did not follow the simple directions to go to a grey two story farm house at the end of Wind Song Valley Road where it takes a sharp right.

6. The scouts took pictures which only showed trees and a door and which admittedly were inadequate to determine whether they had scouted the right house.

7. Although in dispute, the scouts may have seen Lowell in the yard at the correct house while they were scouting the wrong house. (This is a disputed question for the trier of fact to resolve.)

8. When they went to execute the warrant, the officers did not follow the simple directions to go to a grey two story farm house at the end of Wind Song Valley Road where it takes a sharp right.

9. Deputy Engen recognized that Lowell and Anita's house was "over there" at a different location but failed to alert the other officers and continued to participate in the execution of the warrant at the wrong house.

10. The officers did not discern the difference between a grey two story farm house and a bright red A-frame house when they approached, knocked on the door and entered Lyle and Ruth's house.

[¶ 32.] In contrast, Chief Justice Gilbertson points out in his dissent that the following evidence showed the mistaken search was objectively reasonable:

1. The officers were investigating a valid criminal complaint filed by a citizen. Approximately $18,000 in stolen checks was missing. Anita Swedlund was specifically identified by the citizen as the likely thief. Thus, the officers did not seek to enter the Swedlund residence on whim or caprice.

2. They prepared an affidavit to obtain a search warrant from a circuit judge rather than directly entering the home without one and attempting to subsequently rely on an exception to the warrant requirement.

3. They satisfied the circuit judge they had probable cause for the issuance of a warrant and it was so issued.

4. To attempt to make sure they got the right house, they sent an advance scouting party to the rural area of the Swedlund residence.

5. They located the right road but stopped at the first home on it because the sign said "Swedlund," the correct last name of the person they were seeking. There were no house numbers on the residence. At this time none of the officers knew there was more than one Swedlund residence on this road.

6. The correct Swedlund house was in the same neighborhood only one-half mile away on the same road.

7. When the officer who had previously been at Anita's residence five years before, noticed they were now going into a different house marked "Swedlund," he concluded Anita had moved in the previous five years rather than there was a second Swedlund house on that road.

8. The officers entered only the home they thought they were authorized to search. No other buildings or vehicles were entered.

9. The officers properly entered the home and did no damage to the home or its contents once in it.

10. When informed they had searched the wrong house, they made no attempts to further search the premises and promptly left it.

These disputed facts are for the trier of fact to decide. It is not the function of this Court to resolve the facts or to second guess the trier of fact. *Matter of Zech's Estate*, 285 N.W.2d 236, 238 (S.D.1979). We cannot say as a matter of law that the mistaken search of Lyle and Ruth's home was objectively reasonable. Therefore, the trial court correctly denied the motion for summary judgment.

## Excessive Force.

[¶ 33.] Swedlunds further contend that the officers' use of force was excessive. The officers claim, however, that the physical force used on Duane was reasonable under the circumstances. The officers note that they were executing a "high-risk entry" that could have become potentially dangerous.

[¶ 34.] In *Graham*, the Supreme Court held "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ." (emphasis in original) (internal citations omitted). 490 U.S. at 395, 109 S.Ct. at 1871, 104 L.Ed.2d at 454. A determination of whether the force used was reasonable under the Fourth Amendment "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396, 109 S.Ct. at 1871, 104 L.Ed.2d at 455. This Court has previously addressed a § 1983 claim based on excessive force in *Yellowback*, 1999 SD 114 at 11, 600 N.W.2d at 558. In that case we stated that the inquiry of whether the force used violated the Fourth Amendment "is not performed with '20/20 vision of hindsight,' or pursuant to a type of 'Monday morning quarterback' approach in which analysis rests on whether the officers should have pursued alternative strategies or a lesser degree of force."

[¶ 35.] Excessive force was also addressed in *Pray*, 49 F.3d at 1160. In *Pray*, law enforcement officers entered the plaintiffs' lower duplex by mistake during a raid at night, pursuant to a warrant to the upper duplex. According to the Prays,

the officer ordered Mr. Pray to get down on the floor at gunpoint. An officer then placed his hands on Mr. Pray's shoulders and pushed him to the floor. Another officer did the same to Mrs. Pray. As a result, Mrs. Pray suffered injuries to her arthritic knees, later needing surgery. Mr. Pray suffered an attack of angina, which required him to take nitroglycerine pills. The Prays sued the officers, asserting that the officers violated their Fourth Amendment rights, specifically the right to be free from illegal searches and seizures and excessive force. *Id.* at 1157. The court stated:

> The entry and subsequent search and seizure was done without a warrant . . . and no exceptions to the warrant requirement apply with respect to the search of the Pray home. The record clearly shows that the officers, without authority, entered the Pray residence and conducted an illegal search and seizure. Moreover, the Prays had a clear right not to be physically forced to the floor at gunpoint. Thus, if the circumstances were such that the application of force was clearly unnecessary and unreasonable, then the defendants' use of force would be considered excessive.

*Id.* at 1158–59. We note that *Pray* ultimately held that the officers' mistake in entering the plaintiff's home was reasonable under the circumstances and thus protected by qualified immunity. *Id.* at 1159. However, the court also recognized that the officers carried out the raid at night, when vision was poor, and that the officers merely entered the wrong door which led up to the upper duplex (address 716 1/2 Erie Street) as opposed to the door which led to the lower duplex (address 716 Erie Street). *Id.* Additionally, the *Pray* Court held that there was a question of fact with respect to the subsequent search and excessive force claims.

[¶ 36.] Objective reasonableness is not determined from the subjective vantage of the officer. The trier of fact must determine whether a reasonable officer would have believed his actions were lawful. *Hart,* 2000 SD 53 at 26, 609 N.W.2d at 146; *Anderson,* 483 U.S. at 641, 107 S.Ct. at 3040, 97 L.Ed.2d at 532. As with the mistaken search of the wrong house, there is a genuine issue of material fact as to whether the officers' use of force on Duane was objectively reasonable. The following could persuade a trier of fact that the use of force was not objectively reasonable:

1. The officers were making a "high risk entry" to search for stolen checks.
2. Embezzling money or stealing checks from an employer is not a violent crime.
3. There was no mention of drugs in the affidavit for the search warrant.
4. There was no mention that Anita had a prior drug conviction in the affidavit for the search warrant.
5. There was no mention that Anita had previously bitten an officer in the affidavit for the search warrant.
6. Six officers entered the premises with guns drawn.
7. Duane was 48 years old.
8. Duane was sitting in a chair, watching TV and working a jigsaw puzzle when the officers arrived.
9. Duane was not armed.
10. Without provocation, Duane was ordered to get on the floor.
11. Duane was not aggressive until sprayed in the face with pepper spray.

[¶ 37.] In contrast, Chief Justice Gilbertson points out in his dissent that the following evidence showed the officers' use of force was objectively reasonable:

1. Anita Swedlund had a prior history of illegal drug activity.

2. Anita Swedlund had previously bitten an officer.

3. The officers knocked three times, announced their authority and purpose and opened the unlocked door instead of kicking it in.

4. The officers did not know Duane was retarded.

5. Duane did not appear to be rational.

6. Duane did not comply with the officers' commands to get down on the floor.

This disputed evidence is for the trier of fact to resolve. While law enforcement officers are entitled to "freeze" the situation and to make a brief stop of a suspicious individual to determine identity or to maintain the status quo momentarily, *Hodges,* 2001 SD 93 at 17, 631 N.W.2d at 211, we cannot say as a matter of law that the force employed by these officers was objectively reasonable. The trier of fact needs to decide if it was objectively reasonable to force everyone on the premises to get down on the floor at gunpoint when executing a search warrant for missing checks in this case. Therefore, the trial court correctly denied the motion for summary judgment.

[¶ 38.] 2. **WHETHER THE LAW ENFORCEMENT OFFICERS ARE PROTECTED BY COMMON LAW IMMUNITY FROM SWEDLUNDS' STATE LAW INTENTIONAL TORT CLAIMS.**

[¶ 39.] The Swedlunds also sued the law enforcement officers for state law intentional tort claims of assault and battery, intentional infliction of emotional distress, false arrest, false imprisonment and trespass. The officers moved for summary judgment on the state law torts claiming common law immunity or privilege. The trial court denied summary judgment, stating there were genuine issues of material fact on each state tort claim.

[¶ 40.] At common law, law enforcement officers were privileged to use force to do their jobs. Under South Dakota statute, a law enforcement officer is privileged to use necessary force in the performance of a legal duty. SDCL 22–18–2. Also an officer of the law may ordinarily trespass when acting in the scope of his duty. *State v. Cook,* 319 N.W.2d 809, 812 (S.D.1982). Otherwise an arrest would be an assault and a search would be a trespass. The jailer could not incarcerate his prisoners, and the hangman could not execute the condemned without the privilege afforded by the law.

[¶ 41.] Under South Dakota law, a law enforcement officer may arrest a person when the officer has an arrest warrant, SDCL 23A–2–7, or when there is probable cause to believe a crime has been committed and the person to be arrested committed the crime, SDCL 23A–3–2. A law enforcement officer may use that restraint which is reasonable and necessary to effect an arrest and may trespass by breaking into premises to do so. SDCL 23A–3–5. A law enforcement officer is also privileged to use force to arrest someone who has committed a felony. SDCL 22–18–3. At common law and until as recently as 1985, that privilege included reducing a fleeing felon to custody by shooting him to death, SDCL 22–16–32 and 22–16–33; however, now the privilege to use deadly force is limited to situations where there is probable cause to believe the suspect poses a significant threat of death or serious injury to the officer or others. *Garner,* 471 U.S. at 11, 105 S.Ct. at 1701, 85 L.Ed.2d at 9–10. Self defense of the officer and defense of other persons is still recognized as a justification for the use of deadly force, SDCL 22–16–34 and 22–16–35, and a law enforcement officer is

privileged to use force to prevent an offense against the officer or other persons or property as long as the force is not more than sufficient to prevent the offense, SDCL 22–18–4.

[¶ 42.] A search warrant is a written order from a judge directing a law enforcement officer to search for designated personal property and to bring it to the judge. SDCL 23A–35–1. An officer may trespass and break in to any property if admittance is refused. SDCL 23A–35–8. In some cases, the officer may even trespass and break in without notice. SDCL 23A–35–9 (the "no knock" warrant). Like the right to use force to effect an arrest, the privilege is not without limitations. The Fourth Amendment still protects people's right to be secure from unreasonable searches and seizures. If the officer is not executing a valid search warrant, a warrantless search and seizure is unreasonable absent probable cause and exigent circumstances. *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639, 651 (1980); *State v. Jorgensen*, 333 N.W.2d 725, 726 (S.D.1983) (except in certain cases, a search is unreasonable absent a valid search warrant); *Max*, 263 N.W.2d at 687.

[¶ 43.] The officer is privileged to do these things because it is the officer's job. If the officer was not afforded privilege, he could not do his job without being sued for assault and battery, false imprisonment, trespass and other torts. The privilege applies even if the person arrested is later acquitted, or nothing was found during the search, so long as the officer was doing what the law authorized him to do. *Pierson v. Ray*, 386 U.S. 547, 555, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288, 295 (1967). There are, however, limits on the privilege. In *Bego v. Gordon*, 407 N.W.2d 801, 809 n. 11 (1987), this Court recognized that:

A public officer acting within the general scope of his authority is not subject to tort liability for an administrative act or omission if

(a) he is immune because engaged in the exercise of a discretionary function,

(b) *he is privileged and does not exceed or abuse the privilege,* or

(c) his conduct was not tortious because he was not negligent in the performance of his responsibility.

(emphasis added) (citing Restatement of Torts (2nd) § 895D (1979)). Sovereign immunity in subparagraph (a) is not applicable to intentional torts committed by law enforcement officers. *Hart*, 2000 SD 53 at 38, 609 N.W.2d at 148. Here, the officers claim that the privilege in the subparagraph (b) gives them immunity from the Swedlunds' intentional tort claims. Examination of the facts, however, reveals that the officers' conduct is not privileged.

### Trespass

[¶ 44.] The defendants were law enforcement officers conducting a search. Although they had a valid search warrant for Lowell and Anita's house, they did not have a warrant of any kind to search Lyle and Ruth's house. The officers do not claim they were searching under any exception to the requirement of a warrant and none of the exceptions to the warrant requirement applied to the search of Lyle and Ruth's house. *Payton*, 445 U.S. at 586, 100 S.Ct. at 1380, 63 L.Ed.2d at 651; *Max*, 263 N.W.2d at 687. Therefore, the entry and search of Lyle and Ruth's house were without authority. In a factually similar case, where the officers executed a valid warrant on the wrong house, the Sixth Circuit Court of Appeals said:

The entry and subsequent search and seizure was done without a warrant— the warrant only cited Giles at 716½ Erie Street—and no exceptions to the war-

rant requirement apply with respect to the search of the Pray home. The record clearly shows that the officers, without authority, entered the Pray residence and conducted an illegal search and seizure.

*Pray,* 49 F.3d at 1158–59. Since the officers had no authority to search Lyle and Ruth's house, they cannot claim their actions are privileged from the Swedlunds' state tort claims for trespass.

## Assault and Battery, Intentional Infliction of Emotional Distress False Arrest, False Imprisonment

[¶ 45.] During their unauthorized search of Lyle and Ruth's house, the officers entered the house at gunpoint and ordered Duane to get down on the floor. When he did not comply, a scuffle ensued and Duane was eventually beaten into submission. In an everyday encounter, citizens do not have to speak or listen to law enforcement officers. *Florida v. Royer,* 460 U.S. 491, 498, 103 S.Ct. 1319, 75 L.Ed.2d 229, 236 (1983); *Hodges,* 2001 SD 93 at 12, 631 N.W.2d at 209. In *Hodges,* this Court held that a passenger, in a vehicle which has been justifiably detained, may be required to remain at the scene. *Id.* at 13, 17, 631 N.W.2d at 210–11. Here, unlike the officer in *Hodges,* these officers had no authority to search Lyle and Ruth's house.

[¶ 46.] The *Pray* case is more analogous to this situation. In *Pray,* as here, the officers had a valid search warrant but went to the wrong home. The Court of Appeals for the Sixth Circuit noted "the Prays had a clear right not to be physically forced to the floor at gunpoint." *Pray,* 49 F.3d at 1159. Forcing Duane to the floor at gunpoint was not necessary or reasonable. While a law enforcement officer may use reasonable force to effect an arrest, SDCL 22–18–2 and 23A–3–5, Duane was just sitting in a chair, watching TV and working on a jigsaw puzzle. He was not committing a crime. It is not against the law to be retarded, scared or incoherent. There was no probable cause to arrest Duane for any crime.

[¶ 47.] The officers were only looking for missing checks. There was an innuendo that Anita might also be involved with drugs. If there had been probable cause to suspect drugs, drug activity, drug users or drug addicts, the officers could have put their information in the application and gotten a warrant for drugs. There was none and the officers did not even try to get a warrant for drugs. As previously noted, the issue of whether the quest for missing checks justified a high-risk entry in this case is for the trier of fact.

[¶ 48.] The worst that can be said about Duane is that he did not get down on the floor when the officers yelled at him at gunpoint. It is not against the law to refuse to get down on the floor when an officer yells at you. As we can see from *Pray,* Duane had a "clear right not to be physically forced to the floor at gunpoint." 49 F.3d at 1159. Duane was not armed. He was not aggressive until the officers started to spray him with pepper spray and force him to the floor with violence and blows.

[¶ 49.] The officers also claimed that handcuffing Duane was for his own protection. The only danger to Duane was the officers who sprayed him in the face with pepper spray, forced him to the floor with blows and handcuffed him by painfully bending his fingers back. Since the officers did not have legal authority to search the house or probable cause to arrest or detain Duane, their actions are not privileged from the Swedlunds' intentional tort claims of assault and battery, intentional infliction of emotional distress, false arrest and false imprisonment.

[¶ 50.] In addition, the officers were only privileged to use as much force as was necessary. SDCL 23A–3–5. Since there is a genuine issue of material fact as to whether the officers used more force than was necessary, the trial court must require a properly instructed jury to resolve the question. There are genuine issues of material fact on all of the other intentional tort claims when the evidence is viewed in the light most favorable to the Swedlunds. Therefore, the trial court was correct in denying summary judgment to the law enforcement officers on their claim of common law immunity from the intentional torts.

## CONCLUSION

[¶ 51.] The trial court's denial of summary judgment on qualified immunity and common law immunity is affirmed.

[¶ 52.] SABERS and KONENKAMP, Justices, concur.

[¶ 53.] GILBERTSON, Chief Justice and AMUNDSON, Retired Justice, dissent.

[¶ 54.] ZINTER, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.

[¶ 55.] MEIERHENRY, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.

GILBERTSON, Chief Justice (dissenting).

[¶ 56.] I respectfully dissent. I would hold that the officers' entry into the home and the amount of force used therein fall within the good faith immunity from 42 U.S.C. 1983 liability. I cannot join the Court's opinion which results in a de facto judicial repeal of good faith immunity and replaces it with a strict common-law negligence standard to ascertain liability for officers' mistakes.

[¶ 57.] This Court has a previously well-developed analytical framework for the examination of claims of good faith immunity. As the Court today concedes, the mistaken entry into a wrong house by law enforcement by itself, does not strip them of immunity. Mistaken execution of a search warrant at the wrong location does not violate the Fourth Amendment when the officers believe in good faith that they were executing the search warrant at the correct location. *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989); *Maryland v. Garrison,* 480 U.S. 79, 86–88, 107 S.Ct. 1013, 1017–19, 94 L.Ed.2d 72 (1987). The Fourth Amendment is only violated if the mistaken entry was an unreasonable one. *Dawkins v. Graham,* 50 F.3d 532, 535 (8th Cir.1995). This unreasonableness issue is determined under an "objectively reasonable" standard. *Horne v. Crozier,* 1997 SD 65 at 13, 565 N.W.2d 50, 54 (citing *Graham,* 490 U.S. at 397, 109 S.Ct. at 1872, 104 L.Ed.2d at 456). More specifically, negligent or grossly negligent conduct by an officer is not sufficient to become the basis of a constitutional tort claim. *Horne,* 1997 SD 65 at 13, 565 N.W.2d at 54 (additional citations omitted).

[¶ 58.] In this case the following facts are pertinent to an examination of the nature of the officers' conduct:

1. The officers were investigating a valid criminal complaint filed by a citizen. Approximately $18,000 in stolen checks was missing. Anita Swedlund was specifically identified by the citizen as the likely thief. Thus, the officers did not seek to enter the Swedlund residence on whim or caprice.

2. They prepared an affidavit to obtain a search warrant from a circuit judge rather than directly entering the home

without one and attempting to subsequently rely on an exception to the warrant requirement.

3. They satisfied the circuit judge that they had probable cause of the issuance of a warrant and it was so issued.

4. To attempt to make sure they got the right house, they sent an advance scouting party to the rural area of the Swedlund residence.

5. They located the right road but stopped at the first home on it because the sign said "Swedlund," the correct last name of the person they were seeking. There were no house numbers on the residence. At this time none of the officers knew there was more than one Swedlund residence on this road.

6. The correct Swedlund house was in the same neighborhood only one-half mile away on the same road.

7. When the officer, who had previously been at Anita's residence five years before, noticed they were now going into a different house marked "Swedlund," he concluded Anita had moved in the previous five years rather than there was a second Swedlund house on that road.

8. The officers entered only the home they thought they were authorized to search. No other buildings or vehicles were entered.

9. The officers properly entered the home and did no damage to the home or its contents once in it.

10. When informed they had searched the wrong house, they made no attempts to further search the premises and promptly left it.

[¶ 59.] Clearly, prior to the entry of the wrong house, they made several mistakes that resulted in the entry of Lyle and Ruth's house. The two Swedlund houses were not similar in design and the officers had been previously given a description of the correct Swedlund residence. Negligence? Yes, they were negligent. Grossly negligent? Probably not, but for purposes of this analysis even if they were, it still would not establish a basis for liability.[8] For good faith immunity to be swept

8. The court cites the following "facts" in support of its thesis that a question of fact exists which precludes application of good faith immunity for the officers and sends the case to the jury. These "facts" are a rendition of a claim of classic negligence "facts" and no more. In conceding the accuracy of the above facts which support the officers, the Court wholly fails to show how a comparison of the two sets of "facts" arrives at the officers being "plainly incompetent or those who knowingly violate the law;" that being the correct basis to get such a claim to a jury. Instead, we have no more than summary judgment analysis in a negligence case.

 1. The warrant only authorized a search of Lowell and Anita's home, not Lyle and Ruth's home.

 2. Lowell and Anita's home was adequately and unambiguously described as a "grey two story farm house" in the warrant.

 3. Lyle and Ruth's bright red A–frame home did not match the unambiguous description in the warrant.

 4. Sheriff Foster did not send Deputy Engen, who had previously been to Lowell and Anita's home, on the scouting mission. Instead, Foster sent two officers who had never been to Lowell and Anita's house to make sure they had the right house.

 5. The two officers sent to scout for the right house did not follow the simple directions to go to a grey two story farm house at the end of Wind Song Valley Road where it takes a sharp right.

 6. The scouts took pictures that only showed trees and a door, which admittedly were inadequate to determine whether they had scouted the right house.

 7. Although in dispute, the scouts may have seen Lowell in the yard at the correct house while they were scouting the wrong house. (This is a disputed question for the trier of fact to resolve.)

 8. When they went to execute the warrant, the officers did not follow the simple directions to go to a grey two story farm

away, their conduct must be that of the "plainly incompetent or those who knowingly violate the law." *Saucier v. Katz,* 533 U.S. 194, 202, 121 S.Ct. 2151, 2157, 150 L.Ed.2d 272 (2001) (citing *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)). The United States Supreme Court has stated:

> While the purposes justifying a police search strictly limit the permissible extent of the search, the Court has also recognized the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants.

*Garrison,* 480 U.S. at 87, 107 S.Ct. at 1018, 94 L.Ed.2d at 82 (citations omitted). Under a totality of the circumstances, this conduct of the officers was not "plainly incompetent."

[¶ 60.] The comparison of this case by the Court with that of *Hart v. Miller,* 2000 SD 53, 609 N.W.2d 138, most appropriately demonstrates the weakness of the Court's current analysis. In Hart we rejected a defense of good faith immunity by a law enforcement officer for what the plaintiff claimed was an offer to dismiss a criminal charge in exchange for sex. 2000 SD 53 at 29, 609 N.W.2d at 147. It takes no extensive legal analysis to know there is no good faith on the part of a law enforcement officer who solicits sex from a criminal

defendant in that type of case.[9] Compare that with the case now before us where the defendant officers executed a valid search warrant issued by a judge upon a house marked "Swedlund," albeit going to the wrong house next door to the correct one which was also a Swedlund house. Execution of valid search warrants is a legitimate police function. Solicitation of sex in exchange for dismissal of criminal charges clearly is not. 2000 SD 53 at 27, 609 N.W.2d at 146.

[¶ 61.] In failing to apply the correct Saucier standard, the Court in effect abrogates good faith immunity for law enforcement officers. This "new immunity" only protects those officers where there is no question of fact as to their lack of negligence. Thus, this "immunity" is only applicable to those officers' actions where it is not needed, because they did not err in the first place.

[¶ 62.] There likewise is no basis to strip the officers of their good faith immunity for their force used on Duane. This Court has previously stated:

> We must also analyze that question, however, from the perspective of the officer at the scene. That inquiry is not performed with the "20/20 vision of hindsight," or pursuant to a type of "Monday morning quarterback" approach in which analysis rests on whether the offi-

---

house at the end of Wind Song Valley Road where it takes a sharp right.

9. Deputy Engen recognized that Lowell and Anita's house was "over there" at a different location but failed to alert the other officers and continued to participate in the execution of the warrant at the wrong house.

10. The officers did not discern the difference between a grey two story farm house and a bright red A–frame house when they approached, knocked on the door and entered Lyle and Ruth's house.

9. As far as "contested facts" analysis, in *Hart,* this Court still would have allowed good faith immunity despite the contesting claims of the two parties because of the vagueness of the officer's request of "what were they going to do about [the marijuana]?" The plaintiff was only able to overcome the good faith defense because she was able to provide affidavits from other women which established a repeated course of similar conduct by the officer upon them. Herein, the plaintiff can point to no such similar course of improper conduct by the law enforcement officers of Custer County.

cers should have pursued alternative strategies or a lesser degree of force. Rather, the Fourth Amendment only requires that the officer's actions fall within a range of objective reasonableness. This "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make ... judgment—in circumstances that are tense, uncertain, and rapidly evolving— about the amount of force that is necessary in a particular situation.

*Yellowback v. City of Sioux Falls,* 1999 SD 114 at 11, 600 N.W.2d 554, 558 (internal citations omitted).

[¶ 63.] When the officers entered the house, they had valid reasons to believe heightened security was necessary as Anita Swedlund had a prior history of illegal drug activity. Rather than kick the door in, they knocked three times and announced that the Custer County Sheriff's Office was there to serve a search warrant. There was no response. When the officers entered the unlocked house they found only Duane, a full-grown adult, who unknown to them, was mentally retarded. He was unable to identify to the officers the nature of his condition or the reasons he could not comply with the officers' commands.[10] There was no one else in the house to provide the officers with this information. Further, there was nothing identified by the Court which would have given the officers reason to believe they had an individual who could not comply with their commands due to lack of understanding, rather than a person who intentionally would not comply. In the officers' opinions, Duane was refusing to comply with the officers' directives in a manner consistent with individuals under the influence of narcotics.

The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

*Saucier,* 533 U.S. at 202, 121 S.Ct. at 2156, 150 L.Ed.2d at 277 (citations omitted). It is only with a classic application of Monday morning quarterbacking, that the Court somehow concludes that the officers should have objectively known at the time of their entry into the house, that Duane was retarded rather than under the influence of narcotics, and the amount of force they ultimately used was not necessary.

[¶ 64.] Once again the Court errs by extracting eleven "facts" from the record which it concludes creates a question of fact for a jury rather than application of good faith immunity. As with the previous issue, this is another attempt to cast aside good faith immunity and make officers run the gauntlet of a jury proceeding where the plaintiff can come up with no more than a question of fact as to whether the officers were negligent in the performance of their duties.[11]

---

10. When the deputies entered the Swedlund home, Duane was watching television. The deputies ordered him to take a position on the floor. Rather than obey, Duane stood up and began moving toward the deputies with his arms out screaming incoherently: "Ah–ah–ah–ah." He then sat down again. He then got up again and began repeating that behavior. The officers at that time had no idea why he was acting as he did and why he was not rationally responding to their commands. Later when the officers struggled to subdue him, Duane kicked Sheriff Foster and attempted to reach for a large pair of scissors.

11. The "facts" as ascertained by the Court are as follows:
 1. The officers were making a "high risk entry" to search for stolen checks.
 2. Embezzling money or stealing checks from an employer is not a violent crime.
 3. There was no mention of drugs in the affidavit for the search warrant.

[¶ 65.] The Court unsuccessfully tries to isolate the various facts confronting the officers by concluding that they were authorized to look only for missing checks and not illegal drugs. However, under the proper totality of circumstances approach, the officers knew they were looking for missing checks in the possession of those who were known to use illegal drugs and who had a previous history of violently resisting arrest to the point of biting an officer.[12] For a person actually under the influence of narcotics, the amount of force used by the officers was not excessive.

"Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Graham*, 490 U.S. at 396–7, 109 S.Ct. at 1872, 104 L.Ed.2d at 455–6 (citations omit-

ted).[13] Under the Court's erroneous analysis, the most that can be said (if even that) is that the conduct of the officers was negligent in the amount of force they used.

[¶ 66.] In conclusion, the officers' conduct is not even close to being "plainly incompetent" and no evidence exists they knowingly entered the wrong house or used excessive force on Duane. What the Court does in effect today, is overturn *Horne*, and its federal counterparts, strip the officers of good faith immunity and impose on them a strict negligence standard. It is the abolition of good faith immunity; for if the officers are not negligent, that is alone sufficient to avoid liability by itself and good faith analysis as now outlined by the Court is redundant. Such a result has no basis in our jurisprudence and will have a serious chilling effect on the efforts of law enforcement to vigorously execute the laws of this state and protect its citizens. That chill will be most obvious in situations where entry into a private residence may be necessary. Domestic assaults, child abuse, and crack

---

4. There was no mention that Anita had a prior drug conviction in the affidavit for the search warrant.

5. There was no mention that Anita had previously bitten an officer in the affidavit for the search warrant.

6. Six officers entered the premises with guns drawn.

7. Duane was 48 years old.

8. Duane was sitting in a chair, watching TV and working a jigsaw puzzle when the officers arrived.

9. Duane was not armed.

10. Without provocation, Duane was ordered to get on the floor.

11. Duane was not aggressive until sprayed in the face with pepper spray.

12. The officers had been previously told there was a direct nexus between the missing checks and the illegal drug use. The owner of the checks told the Sheriff that he thought Anita was stealing money from his business in order to support her drug habit.

13. Tragically, concerns by law enforcement in this state for their personal safety upon the entry into a home at the hands of its occupant rest upon a factual basis. *See State v. Bittner*, 359 N.W.2d 121 (S.D.1984) (two Huron police officers were summoned to a domestic disturbance and upon entry into the home, both officers were stabbed by the defendant and Officer Tom Callies died). *See also State v. Czmowski*, 393 N.W.2d 72 (S.D.1986) (citing State v. Aikins Crim 85–318 (Eighth Circuit Court Lawrence County, South Dakota, (1985))) (State Trooper Oren Hindman was killed in line of duty); *Bearshield v. City of Gregory*, 278 N.W.2d 166 (S.D.1979) (Officer William Bearshield fatally stabbed in heart by stalker); *State v. Sitts*, 71 S.D. 494, 26 N.W.2d 187 (1947) (Officer Matthews fatally shot in back as he got out of his car to approach defendant's car).

houses all occur behind close doors. Will the officers promptly protect those who they reasonably believe to be in danger, and pursue those whom they reasonably believe to be violating the law, or will they pause?

> That qualified immunity protects government actors is the usual rule; only in exceptional cases will government actors have no shield against claims made against them in their individual capacities.... Unless a government agent's act is so obviously wrong, in light of preexisting law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actors has immunity from suit. Because qualified immunity shields government actors in all but exceptional cases, courts should think long and hard before stripping defendants of immunity.

*Hartsfield v. Lemacks,* 50 F.3d 950, 953 (11th Cir.1995) (citations omitted).

[¶ 67.] For the same reasons as are set forth above, there is no basis not to grant summary judgment on the various state tort claims against the officers.

[¶ 68.] Therefore I respectfully dissent.

AMUNDSON, Retired Justice (dissenting).

[¶ 69.] I join in Chief Justice Gilbertson's dissent for the reasons set forth in my dissent filed in *Hart v. Miller,* 2000 SD 53, 609 N.W.2d 138, based upon the following rationale:

> In the present case, to overcome the first element of the *Horne* test, Hart must "allege the violation of a *clearly established constitutional or statutory right.*" See *Comfort v. Town of Pittsfield,* 924 F.Supp. 1219, 1227 (D.Maine 1996) (emphasis added).... In discussing application of qualified immunity, the Maine District Court stated, [t]he Supreme Court has extended qualified immunity generously, imposing a heavy burden on plaintiffs to establish liability. [citation omitted.] This policy is justified on a variety of grounds, not least of which is a fear that "personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties."

\* \* \*

> The Eighth Circuit Court of Appeals found [in ruling on a § 1983 claim] that Reeve had no claim and held, [Reeve] has failed to allege a constitutional violation.... As we stated in *Gregory v. City of Rogers,* 974 F.2d 1006, 1009 (8th Cir. 1992), *cert. denied,* [507 U.S. 914], 113 S.Ct. 1265, 122 L.Ed.2d 661 (1993), *"Many harms, though caused by a state actor, do not fall within the scope of section 1983, for section 1983 does not turn the Fourteenth Amendment into a font of tort law that supersedes the tort systems already available under individual state laws."*

*Id.* at 59, 63, 609 N.W.2d 138 (emphasis added). In this case, the Court is allowing the "1983 font of tort law," to remain open.

